# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-1351

_____

Gloria Coleman,                          *
                                         *
                Appellee,                *
                                         *
     v.                                  * Appeal from the United States
                                         * District Court for the
Nurse Ruth Rahija, Nurse at              * Southern District of Iowa
IMCC - Oakdale,                          *
                                         *
                Appellant.               *


_____

Submitted:  October 22, 1996

Filed:  June 5, 1997

_____

Before RICHARD S. ARNOLD, Chief Judge, and FLOYD R. GIBSON and
       McMILLIAN, Circuit Judges.

_____

McMILLIAN, Circuit Judge.


        Gloria Coleman brought this action in the United States District
Court for the Southern District of Iowa, pursuant to 42 U.S.C. § 1983,
claiming that Ruth Rahija was deliberately indifferent to her serious
medical needs in violation of her Eighth Amendment right to be free from
cruel and unusual punishment.  Rahija now appeals from the district court's
final order, following a bench trial, holding that Rahija was deliberately
indifferent to Coleman's serious medical needs and awarding Coleman $1,000
in compensatory damages and $3,500 in punitive damages.  <u>Coleman v.</u>

-1-

<u>Rahija</u>, No. 4-91-CV-50260 (S.D. Iowa Jan. 2, 1996) (<u>Coleman</u>).  For reversal, Rahija argues that the district court erred in finding that (1) Coleman had a serious medical need; (2) Rahija had sufficient knowledge of Coleman's serious medical need to justify a finding of deliberate indifference; (3) Coleman suffered actual harm as a consequence of Rahija's actions; and (4) Rahija's conduct was sufficiently callous to support an award of punitive damages.  For the reasons discussed below, we vacate the award of punitive damages and affirm the order of the district court on the remaining issues.

## I. Background

The factual background is primarily based on the findings of the district court.  <u>Id.</u> at 1-10.  On January 15, 1991, Coleman, an inmate, was transferred from the Iowa Correctional Facility for Women in Mitchellville, Iowa, to the Iowa Medical and Classification Center (IMCC) in Oakdale, Iowa.  At that time, Coleman was twenty-eight years old and approximately seven months pregnant.  She was transferred to IMCC to facilitate closer monitoring of her pregnancy.  Rahija was a registered nurse employed by IMCC.[1]

Upon Coleman's arrival at IMCC, the IMCC Health Services Department (Health Services) conducted a "health screen" and documented Coleman's health history, including the fact that Coleman had five prior pregnancies. Dr. Timothy Pflederer, a Health Services physician, conducted a routine physical examination of Coleman on January 23, 1991, and noted in his examination notes

---

[1]In her answer, Rahija asserted qualified immunity as an affirmative defense but failed to argue it in the district court. She also failed to make a qualified immunity argument to this court.

-2-

that Coleman had a long history of problematic pregnancies. In 1980, Coleman prematurely delivered twins who were either stillborn or died shortly after birth. Of Coleman's subsequent four pregnancies, three involved precipitous labors lasting less than one hour and one resulted in a premature delivery. Based on this information, Dr. Pflederer referred Coleman to the University of Iowa Hospitals and Clinics Obstetrical Unit (the University) for an evaluation. On January 30, 1991, Dr. Katherine Stevenson, a University resident physician, examined Coleman and discovered that her cervix was one to two centimeters dilated. She reported that Coleman's obstetric history was "significant" and recommended that Coleman remain at IMCC due to its proximity to the University and Coleman's history of pre-term deliveries.

On January 31, 1991, a notation was made in the Health Services records that Coleman had been examined at the University and was to remain at IMCC until after the baby was born. On February 2, 1991, at approximately 8:45 a.m., Coleman awoke and went to Health Services, complaining that her "water" was "leaking." A Health Services nurse examined Coleman and determined that Coleman's amnion had not ruptured. Instead, the nurse determined that Coleman was experiencing normal mucous vaginal discharge which commonly occurs during the later stages of pregnancy. The nurse gave Coleman sanitary napkins and instructed her to notify Health Services if her condition worsened.

On February 14, 1991, Coleman returned to Health Services complaining that she "had a bloody show." At that time, Health Services transferred Coleman to the University for an examination. The University physicians determined that Coleman was not in active labor but noted that her cervix was dilated one to two centimeters and she was having minimal contractions. The University physicians instructed Health Services to return Coleman to the University if

her contractions became painful, regular, and separated by ten minutes or less.[2]

On February 15, 1991, Coleman awoke early in the morning and noticed some spotting of blood. She complained of bleeding, back pain, and stomach pain to a guard, who sent her to Health Services. She notified Health Services of the spotting and decided not to attend her required school classes that day. At approximately 10:30 a.m., Coleman again reported to Health Services complaining of more bleeding and back pain. Although Coleman denied being terribly uncomfortable, Coleman's symptoms were recognized signs of labor and led the IMCC nursing staff to call the University. Dr. Alvina Driscoll, a University resident physician, determined that the bleeding was likely due to cervical changes and was not a concern unless it increased or was associated with cramping or contractions. The IMCC nursing staff recorded in Coleman's medical chart that she was to be monitored for increased bleeding or signs of labor. The bleeding was to be monitored by inspecting Coleman's sanitary napkins. Coleman returned to Health Services at approximately 2:00 p.m. to complain of more bleeding and show a nurse a sanitary napkin with blood on it. After looking at the sanitary napkin, the nurse threw it in the garbage.

At approximately 7:00 p.m., Coleman was watching television when she stood to use the bathroom and felt an extreme pain in her lower abdomen causing her to double over. Coleman's pain began to subside when another inmate, Felicia Allen, attempted to comfort her. Sometime thereafter, Coleman went to Health Services and was seen by Rahija, who had come on duty at 3:00 p.m. Without taking Coleman's vital signs, performing a vaginal examination, or

---

[2]Under IMCC's policy, a pregnant woman is transferred to the University when she is in active labor. Brief for Appellant at 10.

-4-

attempting to monitor the baby's heart tones, Rahija sent Coleman back to her living unit and told her to return when the contractions were six to seven minutes apart.

At approximately 9:30 p.m., Coleman's pain worsened.  She returned to Health Services and reported to Rahija that she was still bleeding, she hurt "down there," pointing to her abdomen, and her contractions were six minutes apart.  Rahija placed her hands on the exterior of Coleman's abdomen and noted that she was unable to feel any contractions.[3]  Rahija monitored the baby's heart tones, which were 142 beats per minute.  At that time, Coleman denied experiencing low back pain or rupturing of her amnion.  Despite concluding that Coleman was in "possible early labor," Rahija sent Coleman back to her living unit and instructed her to return to Health Services if the bleeding increased or the contractions increased in severity or regularity.

Following Rahija's instructions, Coleman returned to her living unit.[4]  Coleman sat on the edge of her bed in increasing pain until 11:25 p.m., when she began to scream from the intense pain and moved to the cement floor, where she laid in a fetal position.  A correctional officer allowed Allen and another inmate to enter Coleman's living unit to attempt to calm her by talking to her and rubbing her back and stomach.

At that point, a correctional officer called Health Services to summon Rahija and Grace Schwickerath, also a registered nurse,

---

[3]Health Services did not have any equipment to monitor Coleman's contractions, and Rahija was not qualified to perform a vaginal examination of Coleman to monitor any cervical changes.

[4]Notably, at no time prior to her transfer to the University at approximately 11:45 p.m. on February 15, 1991, did Coleman receive the assistance of a wheelchair.

to attend to Coleman.  When they arrived, Coleman stated that she was in pain and felt "like pushing."  The nurses observed that Coleman appeared to be "bearing down."  Both nurses placed their hands on the exterior of Coleman's abdomen and were unable to feel any contractions.  One of the nurses monitored the baby's fetal heart tones, which were 120 beats per minute.  The nurses asked Coleman to stand to allow them to inspect her sanitary napkin.  As Coleman stood, she "grunted" and expelled approximately 15cc of dark red blood.  Coleman's sanitary napkin indicated that she had been spotting previously.  Coleman stated that she "should go ahead [and] just have this baby [and] that would teach you for not listening."  Id. at 9.[5]  At that point, the nurses agreed that Coleman should be transported to the University and Schwickerath went to make the necessary arrangements.  Rahija stayed with Coleman and noted that Coleman was probably in premature labor.  However, Schwickerath noted that Coleman was in "questionable labor."  Id.

At approximately 11:45 p.m., Coleman was transported from IMCC to the University.  While transporting Coleman, the attending medical professionals repeatedly called Coleman's name to prevent her from falling asleep.  Coleman constantly felt the urge to push and, sometime during the ride, expelled another 20cc of blood.  Shortly after arriving at the University, Coleman delivered a premature baby boy at 12:20 a.m. on February 16, 1991, although she was later unable to remember the delivery.  Neither Coleman nor the baby suffered any complications during the delivery.  Coleman

---

[5]The district court recognized that Coleman was "understandably uncooperative" because she believed that her child was about to be born yet was unable to obtain any assistance from the nursing staff.  See Coleman v. Rahija, No. 4-91-CV-50260, slip op. at 9 n.6 (S.D. Iowa Jan. 2, 1996).

returned to IMCC on February 18, 1991, and the baby was later released from the hospital to the care of Coleman's mother.

On March 3, 1991, Coleman completed a form complaint used by prisoners to file complaints under the Civil Rights Act, 42 U.S.C. § 1983, alleging that Rahija violated Coleman's Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to Coleman's complaints that she was in labor, which caused her to suffer both physically and emotionally. Coleman's complaint was filed in the United States District Court for the Southern District of Iowa on April 29, 1991.

On September 27-28, 1994, this matter was tried to the district court, sitting without a jury. The case remained open for further depositions and was completed on April 10, 1995. The district court held that Rahija's conduct deprived Coleman "'of the minimal civilized measure of life's necessities' afforded her by the Eighth Amendment," id. at 19-20, quoting Whitnack v. Douglas County, 16 F.3d 954, 957 (8th Cir. 1994), and awarded Coleman $1,000.00 in actual damages and $3,500.00 in punitive damages, id. at 24. The district court held that, while some evidence suggested that Coleman should have been taken to the University at 7:00 p.m. on February 15, 1991, the greater weight of the evidence indicated that, at 9:30 p.m., a reasonable person would have concluded that Coleman was in labor and in need of proper medical attention provided by the University. Id. at 21. The district court held that Rahija was accountable for Coleman's pain and suffering between 9:30 p.m. and 11:30 p.m., when Coleman was finally transferred to the University. Id. The district court further held that Rahija's conduct in delaying Coleman's transfer to the University rose to the level of callousness and warranted punitive damages to prevent such an occurrence in the future. Id. at 23-24. This appeal followed.

## II. Discussion

To prevail on an Eighth Amendment claim, an inmate must show both an objective element, that the deprivation was sufficiently serious, and a subjective element, that the defendant acted with a sufficiently culpable state of mind.  Choate v. Lockhart, 7 F.3d 1370, 1373 (8th Cir. 1993), citing Wilson v. Seiter, 501 U.S. 294, 302-03 (1991).  In a deprivation of medical care case, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs.  Camberos v. Branstad, 73 F.3d 174, 175 (8th Cir. 1995).  In order to succeed, an inmate must show both that he or she had an objectively serious medical need and that the defendant knew of and disregarded that need.  Miller v. Schoenen, 75 F.3d 1305, 1309 (8th Cir. 1996), citing Estelle v. Gamble, 429 U.S. 97, 105 (1976), and Farmer v. Brennan, 511 U.S. 825, 837 (1994) (Farmer).  Each step of this inquiry is fact-intensive, and we review the district court's factual conclusions for clear error.  Jensen v. Clarke, 94 F.3d 1191, 1197-98 (8th Cir. 1996).

### A.    Serious Medical Need

The initial question presented in this case is whether the district court's finding that Coleman had a serious medical need is clearly erroneous.  A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Camberos v. Branstad, 73 F.3d at 176.  When an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, "the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment." Crowley v. Hedgepeth, 109

F.3d 500, 502 (8th Cir. 1997).  An inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs.  Id.

In this case, the district court found that Coleman was experiencing pre-term labor and concluded that her condition was sufficiently serious to constitute a serious medical need.  Specifically, the district court found that Coleman's medical records indicated that she had a propensity of rapid labor and delivery; she was exhibiting some sign of possible labor in the early afternoon on February 15, 1991; Rahija noted that Coleman was in "possible early labor" at 9:30 p.m.; and Coleman believed the matter sufficiently serious to continue seeking medical treatment.  Coleman at 13-14.  The district court also recognized six factors which might signal pre-term labor, five of which could be determined by an external examination, and found that Coleman had four of the five observable factors.  Id. at 16-17.  These four factors included: (1) an increase in vaginal discharge; (2) a "bloody show"; (3) uterine contractions six minutes apart; and (4) abdominal pain possibly attributable to a tightening of her pelvis and earlier complaints of lower back pain.  Id.  The district court was also persuaded that had Rahija performed a vaginal examination of Coleman, there would have been evidence of progressive dilatation and effacement of the cervix.  Id. at 17.

Rahija argues that the district court's finding that Coleman had a serious medical need is clearly erroneous.  Rahija cites Boxwell v. County of Sherburne, 849 F.2d 1117 (8th Cir. 1988), for the proposition that pregnancy alone is not necessarily a serious medical need and claims that Coleman failed to present evidence of unusual circumstances related to her pregnancy to raise it to the level of a serious medical need.  Rahija contends that Coleman was

not in active labor until 11:25 p.m. on February 15, 1991, because, based on Coleman's previous precipitous deliveries, had she been in labor at 9:30 p.m., the baby would have been born before 12:20 a.m. Rahija also claims that the district court clearly erred in finding that Coleman complained of back pain at approximately 10:30 a.m. that day because the medical records indicate that Coleman reported "[b]leeding again - back uncomfortable but no pains." Brief for Appellant at 5, citing Appendix at 325.

Based on the evidence presented at trial and relied upon by the district court, we conclude that the relevant factual findings of the district court, as outlined above, are not clearly erroneous. While a woman's pregnancy is generally not, alone, a serious medical need, Coleman presented evidence of her previous rapid labors and premature deliveries to establish a substantial risk of pre-term labor. See Boxwell v. County of Sherburne, 849 F.2d at 1122 (risk of miscarriage where pretrial detainee was six and one-half months into problem pregnancy, was bleeding, had previously fainted, and had history of rapid labor). A layperson would have recognized the necessity for a doctor's attention at 9:30 p.m. See Camberos v. Branstad, 73 F.3d at 176 (a serious medical need is one that is so obvious that a layperson would recognize the necessity for a doctor's attention). Also, based on the district court's factual findings, Coleman's symptoms satisfied the requirements for transfer as set forth by the University physicians. See id. (a serious medical need is one that has been diagnosed by a physician as requiring treatment). We therefore hold that the district court did not clearly err in concluding that Coleman's physical condition constituted a serious medical need.

We also hold that Coleman presented sufficient "verifying medical evidence" that Rahija "ignored a critical or escalating situation or that the delay posed a substantial risk of serious

harm" for her claim to succeed.  See Beyerbach v. Sears, 49 F.3d 1324, 1327 (8th Cir. 1995) (inmate's failure to present verifying medical evidence constituted failure to establish objective component of claim); see also Crowley v. Hedgepeth, 109 F.3d at 502.  Specifically, Coleman presented expert testimony that the urge to push during the delivery process is an involuntary reaction, see Coleman at 18, indicating that Coleman, in fact, had been in labor, see Appendix at 48 (deposition testimony of Dr. Paul Loeffelholz),[6] and that the delay in her treatment posed a substantial risk of serious harm.

B.    Deliberate Indifference

Having held that the district court did not clearly err in finding that Coleman's condition constituted a serious medical need, we now address the question whether the district court's finding that Rahija was deliberately indifferent to Coleman's serious medical need is clearly erroneous.  This question, like the first step in our analysis, is a question of fact reviewed for clear error.  Jensen, 94 F.3d at 1198.  To satisfy this subjective element, Farmer requires a finding of actual knowledge on the part of the defendant.[7]  Jensen v. Clarke, 94 F.3d at 1195 (failure-to-protect case applying same two-step analysis).  A prison official may be held liable under the Eighth Amendment if he or she knows that an inmate faces a substantial risk of serious harm and

---

[6]Dr. Paul Loeffelholz, the clinical director for IMCC and medical director for the Iowa Department of Corrections, testified that "bearing down" is a voluntary activity to help expel the fetus once the cervix is fully dilated.  Appendix at 48.

[7]Although Farmer v. Brennan, 511 U.S. 825 (1994), is a conditions-of-confinement case, the analytical model it provides applies equally to deprivation of medical care cases.  Beyerbach v. Sears, 49 F.3d 1324, 1326 n.1 (8th Cir. 1995).

-11-

disregards that risk by failing to take reasonable measures to abate it. Farmer, 511 U.S. at 847. "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996). Moreover, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his [or her] knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842. The factual determination that a prison official had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence or from the very fact that the risk was obvious. Id.

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk [to the inmate's health] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

Id. at 842-43 (internal quotations omitted).

The district court, in this case, concluded that Rahija had actual knowledge of Coleman's serious medical need. The district court based its finding on the documentation in Coleman's medical records of her previous precipitous labors, the IMCC officials' election to keep Coleman at IMCC until after delivery because of her medical history, Rahija's notation that Coleman might have been in possible early labor, and Coleman's objective symptoms that she was experiencing pre-term labor. Coleman at 14-15, citing Farmer,

511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

Rahija argues that the district court clearly erred in finding that she had the requisite knowledge to constitute deliberate indifference. Rahija claims that Coleman did not have painful, regular contractions less than ten minutes apart, increased heavy bleeding, or bleeding with contractions until 11:25 p.m., at which point Rahija determined that Coleman should be sent to the University. Thus, Rahija contends that she was not deliberately indifferent to Coleman's condition because her treatment of Coleman was consistent with the University physician's (Dr. Driscoll's) advice.

In this case, the district court's conclusion that Nurse Rahija had actual knowledge based on the obviousness of Coleman's serious medical need is not clearly erroneous. Coleman's propensity for precipitous labor and premature delivery was well-documented and expressly noted by prison officials in Coleman's medical records, to which Rahija had been exposed, and constituted the sole reason for Coleman's placement at IMCC. From this evidence, a trier of fact could have found that Rahija had actual knowledge of the risk of pre-term labor. See Farmer, 511 U.S. at 842-43; Jensen, 94 F.3d at 1198. We therefore hold that the district court did not clearly err in finding that Rahija's unnecessary delay in transferring Coleman to the University constituted deliberate indifference to Coleman's serious medical need. See Johnson-El v. Schoemehl, 878 F.2d 1043, 1055 (8th Cir. 1989) ("Delay in the provision of treatment or in providing examinations can violate inmates' rights when the inmates' ailments are medically serious or painful in nature.").

C.    Compensatory Damages


Compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering. Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 307 (1986) (Stachura). Specifically, mental and emotional distress, which include mental suffering and emotional anguish, constitute compensable injury under § 1983. Carey v. Piphus, 435 U.S. 247, 264 & n.20 (1978). While such injuries are essentially subjective, they may be evidenced by the plaintiff's conduct and observed by others. Id. at 264 n.20. Additionally, evidence of physical pain and suffering may support an award of compensatory damages in excess of any actual out-of-pocket medical expenses. Jackson v. Crews, 873 F.2d 1105, 1109 (8th Cir. 1988).


Rahija argues that the record does not support the district court's finding that Coleman was subjected to pain and suffering from 9:30 p.m. until 11:30 p.m. Instead, Rahija suggests that Coleman experienced nothing different from what women endure during childbirth and that Coleman had access to a television and a bed as if she was in a hospital. She concludes that had she transferred Coleman to the University at 9:30 p.m., as suggested by the district court, Coleman would have experienced the same labor in the hospital as she did in her living unit, and, therefore, there was nothing unconstitutional about where Coleman experienced labor or how Rahija treated her.

We disagree and hold that the evidence supports the district court's award of compensatory damages for Coleman's physical pain and suffering and mental anguish and suffering. Fortunately, neither Coleman nor her baby suffered any complications during the delivery at the University. However, the fact remains that,

-14-

because of Rahija's unnecessary delay, Coleman was subjected to "a great deal of fear and physical suffering [which] accompanied the prospect of having a baby on the floor of a penal institution," Coleman at 21, without the appropriate medical attention. We therefore hold that the district court did not clearly err in finding that Coleman suffered a compensable injury under § 1983.

D.    Punitive Damages

In a § 1983 case, both compensatory and punitive damages are available upon proper proof. Cunningham v. City of Overland, 804 F.2d 1066, 1069 (8th Cir. 1986), citing Stachura, 477 U.S. at 306 & n.9. But unlike compensatory damages, which are mandatory and are awarded as a matter of right once liability is found, punitive damages are awarded or rejected in a particular case at the discretion of the fact finder once sufficiently serious misconduct by the defendant is shown. Smith v. Wade, 461 U.S. 30, 52 (1983); McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 508 (1st Cir. 1996) (Title VII case). Punitive damages are awarded to "punish the defendant for his [or her] willful or malicious conduct and to deter others from similar behavior." Stachura, 477 U.S. at 306 n.9. The focus, in determining the propriety of punitive damages, is on the intent of the defendant, Cunningham v. City of Overland, 804 F.2d at 1070, and whether the defendant's conduct is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards. Smith v. Wade, 461 U.S. at 54. Punitive damages are appropriate in a § 1983 case "'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Walters v. Grossheim, 990 F.2d 381, 385 (8th Cir. 1993), quoting Smith v. Wade, 461 U.S. at 56.

To impose a punitive award in this case, the district court was required to find not only that Rahija's conduct met the callousness threshold, which is a question of ultimate fact, but also that her conduct merited a punitive award of $3,500 in addition to the compensatory award, which is a discretionary moral judgment. Smith v. Wade, 461 U.S. at 52. Applying this standard, the district court awarded Coleman $3,500.00 in punitive damages "so that prison officials recognize the seriousness of this lack of action and guard against it in the future." Coleman at 24.

A finding of deliberate indifference to a serious medical need, while establishing liability under § 1983, does not necessitate a finding of callous indifference warranting punitive damages. See Standley v. Chilhowee R-IV Sch. District, 5 F.3d 319, 323 (8th Cir. 1993) (defendant was liable under § 1983 for violating plaintiff's First Amendment rights, but there was insufficient evidence that defendant's conduct rose to the level of "evil motive" or "reckless or callous indifference" to justify punitive damages); see also Cornell v. Woods, 69 F.3d 1383, 1391 (8th Cir. 1995) (prison officials' conduct in punishing inmate for exercising his First Amendment rights established liability under § 1983 but did not warrant imposition of punitive damages); Ivey v. Wilson, 832 F.2d 950, 956 (6th Cir. 1987) (prison officials' acts violated prisoner's due process rights and gave rise to § 1983 liability, but punitive damages award was improper because there was no evidence that defendants "were acting in bad faith" or "harbored any ill will" towards plaintiff); Walters v. City of Atlanta, 803 F.2d 1135, 1147 (11th Cir. 1986) (upholding jury's finding that "defendants were responsible for the racial discrimination" plaintiff suffered, but vacating punitive damages award because the record did not show that defendants "acted with either the requisite ill will or callous disregard of [plaintiff's] federally protected rights"); Lavicky v. Burnett, 758 F.2d 468, 477

(10th Cir. 1985) (unlawful search and seizure and taking of plaintiff's property without a hearing gave rise to § 1983 liability, but punitive damages award was properly set aside because "there was no evidence of malice, wantonness, or oppressiveness"), <u>cert. denied</u> 474 U.S. 1101 (1986); <u>Soderbeck v. Burnett County</u>, 752 F.2d 285, 289 (7th Cir.) (plaintiff's showing of political dismissal was sufficient for compensatory damages, but not punitive damages), <u>cert. denied</u> 471 U.S. 1117 (1985); <u>Hernandez-Terado v. Artau</u>, 874 F.2d 866, 872 (1st Cir. 1989) (same). After reviewing the evidence presented at trial, we hold that Rahija's conduct in this case was not sufficiently egregious to justify the imposition of punitive damages. <u>See</u> <u>Cornell v. Woods</u>, 69 F.3d at 1391. Coleman admits that Rahija testified that she relied on, and attempted to follow, the University physicians' instructions in caring for Coleman. <u>See</u> Brief for Appellee at 27, 28 n.12. While Rahija is liable under § 1983 for her delay in treating Coleman, her conduct does not rise to the level calling for punishment and deterrence over and above that provided by the compensatory award. <u>See</u> <u>Smith v. Wade</u>, 461 U.S. at 54; <u>see also</u> <u>Stachura</u>, 477 U.S. at 310 ("Section 1983 presupposes that damages that compensate for actual harm ordinarily suffice to deter constitutional violations."). The facts of this case illustrate the difference between conduct justifying mere liability under the Eighth Amendment and conduct justifying punitive damages under § 1983. Because the district court abused its discretion in awarding punitive damages over and above the compensatory award, we vacate the punitive damages award.

### III. Conclusion

Accordingly, the punitive damages award is vacated and the order of the district court is affirmed in all other respects.

FLOYD R. GIBSON, Circuit Judge, concurring in part and dissenting in part.


Though I am in full accord with the Court's decision to affirm the imposition of compensatory damages against Nurse Ruth Rahija, I cannot agree that the district court's award of punitive damages should be reversed. In my view, the rather startling and disturbing facts of this case reveal the district court did not commit clear error when it found that Rahija acted with "callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). Furthermore, I believe the district court correctly determined that Nurse Rahija's behavior was "simply inexcusable" and of a type that "must be punished in an appropriate way so that prison officials recognize the seriousness of this lack of action and guard against it in the future." Coleman v. Rahija, No. 4-91-CV-50260, at 24 (S.D. Iowa Jan. 2, 1996); see also Smith, 461 U.S. at 54 ("The focus is on the character of the tortfeasor's conduct -- whether it is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards."). As a result, I am unable to conclude that the district court abused its discretion when it deemed punitive damages appropriate. For these reasons, I respectfully dissent from that portion of the Court's opinion vacating the district court's punitive damages award.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-18-