**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**
Nos. 96-4107; 97-1656

| | | |
|---|---|---|
| Equal Employment Opportunity Commission, | * | |
| | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| Bruce M. Ey, | * | |
| | * | |
| Intervenor Below - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| HBE Corporation, doing business as Adam's Mark Hotel, | * | |
| | * | |
| | * | |
| Defendant - Appellant. | * | Appeals from the United States |
| | * | District Court for the |
| ------------------------ | * | Eastern District of Missouri. |
| | * | |
| Equal Employment Opportunity Commission, | * | |
| | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| Dewey R. Helms, | * | |
| | * | |
| Intervenor Below - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| HBE Corporation, doing business as Adam's Mark Hotel, | * | |

Defendant - Appellant.

_____

Submitted: September 8, 1997
Filed: January 27, 1998
_____

Before McMILLIAN, BRIGHT, and MURPHY, Circuit Judges.
_____

MURPHY, Circuit Judge.

HBE Corporation, doing business as Adam's Mark Hotel (Adam's Mark), appeals from a judgment in favor of the Equal Employment Opportunity Commission (EEOC) and former employees Dewey Helms and Bruce Ey on claims of racial discrimination and retaliatory discharge. Appellees were awarded front pay and injunctive relief under Title VII, 42 U.S.C. §§ 2000e-2 and 2000e-3, and back pay, lost benefits, and punitive damages under the Missouri Human Rights Act (MHRA), Mo. Ann. Stat. §§ 213.055 and 213.070 (West 1997). Appellant seeks judgment in its favor on the retaliatory discharge claim and a new trial on the racial discrimination claim. It also objects to the awards of front pay, punitive damages, and attorney fees and to the scope of injunctive relief. We affirm in part and reverse in part.

## I.

Helms and Ey were employees at the Adam's Mark until they were discharged on September 12, 1991. At that time Dewey Helms, an African American, had been the employment manager since February 12, 1990, and Bruce Ey had been the director of personnel since April 8, 1991. Helms' initial performance review had rated him "satisfactory plus" and reflected "very good feedback" from management. An August,

1991 performance review said he "exceeds standards" although it was later changed to "meets standards" when Maurice Briquet, the general manager of the hotel, said he did not want managers described as exceeding standards. The turnover rate of hourly employees steadily declined during Helms' tenure at the Adam's Mark. Managers of various divisions said he was easy to work with and that he consistently referred qualified, reliable applicants for employment positions. Based on this record Bruce Ey, who was Helms' superior in the personnel department, recommended that Helms receive an 8.7 percent salary increase, an above average raise.

On September 5, 1991 Ey recommended to Erick Ohlsson, the corporate director of personnel, that Helms be promoted to the vacant position of assistant director of personnel. The Adam's Mark executive committee coordinated operations at the hotel, and it supported the promotion. Helms was the first African American to be employment manager and was one of four blacks among the seventy nine managers at the hotel. The four black managers were among the lowest paid. Ey testified at trial that blacks held about half of the non-management positions at the hotel and that the labor pool in St. Louis was predominantly black.

Fred Kummer, the chief executive officer and primary owner of the Adam's Mark corporate parent, controlled personnel decisions at the hotel and was closely involved in employment matters. Kummer testified at trial that he decided to fire Helms because the personnel department was "a disaster." He stated that in the personnel files for which Helms was responsible there were incomplete applications and reference checks, unexplained gaps in employment histories, and failures to note changes in applicants' compensation patterns. After Kummer expressed his desire to terminate Helms, Ohlsson audited seven of his personnel files on September 10, 1991. He discovered that all seven met company requirements for employment histories, reference checks, and full completion. They did not reveal the deficiencies given as a reason to fire Helms.

-3-

When Ohlsson told Ey that the corporate office wanted to fire Helms, Ey objected. Ey believed that the decision to fire Helms was racially motivated. On September 6, Briquet had told him that Kummer wanted to get rid of Helms because it was getting "too dark" in Chestnut's (a cafe near the front entrance in the Adam's Mark) since Helms was "hiring too many blacks." Briquet had earlier told Ey at his job interview that Helms was "a good man, but they're worried about two blacks in there" and that "I think we can handle that." Mike Hess, a former director of corporate personnel, told Ey that Kummer's policy was to exclude blacks from important positions at the hotel such as general manager or director of personnel. Ey spoke with general manager Briquet and other members of the executive committee in an attempt to prevent Helms' discharge.

When Ohlsson asked Ey on September 12 how he planned to terminate Helms, Ey said he would not do it because he thought the decision was racially motivated. Ohlsson then called Kummer and Robert Coleman, the vice president of operations, to inform them about Ey's position. They directed Ohlsson to discharge both Ey and Helms, and he did so immediately. Helms was the first employment manager to be fired at the hotel; all previous managers had either left voluntarily or been promoted. Kummer testified at trial that he was angry when Ey recommended Helms for assistant director of personnel because that position was being eliminated to save money. He claimed it was for this reason that he decided to discharge Ey and that he told Ohlsson and Coleman to terminate him at an appropriate time.

Helms and Ey filed complaints with the EEOC which decided to file these lawsuits under Title VII on their behalf. Helms and Ey then intervened, asserting claims under both Title VII and the MHRA. The two cases were consolidated for trial which lasted over three weeks. The jury found for Helms on his MHRA claim of racial discrimination and awarded him $52,657 in back pay and lost benefits and $3,800,000 in punitive damages. The jury also found in favor of Ey on his claim of retaliatory discharge and awarded him $60,000 in back pay and benefits and $1,000,000 in

punitive damages. On the Title VII claims the court awarded front pay to Helms in the amount of $68,239 and to Ey in the amount of $131,571. The court also granted a permanent injunction against Adam's Mark to prevent future discrimination, to provide for reporting to the EEOC, and to redress the harm to Helms and Ey. Finally, the court awarded Helms and Ey attorney fees and costs: $89,313.50 to Helms and $158,204.43 to Ey.

Adam's Mark filed a motion for judgment as a matter of law or, alternatively, for a new trial, as well as a request for remittitur. The district court denied these motions, and Adam's Mark appealed from the judgment and the denial of its post trial motions.[1] Adam's Mark claims the two cases should not have been consolidated, objects to certain evidentiary rulings, and argues that the evidence was insufficient for a retaliatory discharge claim or for punitive damages. It also objects to the amount of the punitive damage and front pay awards and to the scope of equitable relief.

## II.

Adam's Mark argues that the district court erred in consolidating the cases of Helms and Ey, in allowing a jury trial on their MHRA claims, and in failing to bifurcate the issues of liability and punitive damages. It complains that the consolidation permitted evidence relevant only to Helms to be considered in connection with Ey and permitted the MHRA claims to be heard by a jury. It also argues that trying liability at the same time as punitive damages led to the introduction of inflammatory evidence which improperly affected the result.

---

[1]This appeal was docketed as case 96-4107. A separate appeal from the judgment for attorney fees and costs was docketed as case 97-1656 and consolidated with the main appeal.

All claims and issues sharing common aspects of law or fact may be consolidated to avoid unnecessary cost or delay, Fed. R. Civ. P. 42(a), and consolidation should be upheld unless there has been a clear abuse of discretion, EPA v. City of Green Forest, Arkansas, 921 F.2d 1394, 1402 (8th Cir. 1990). Consolidation is inappropriate, however, if it leads to inefficiency, inconvenience, or unfair prejudice to a party. Fed. R. Civ. P. 42(b).

These cases have common questions of law and fact. Appellees all sought to present similar evidence about a climate of racial hostility at the Adam's Mark and the events immediately preceding and following Helms discharge. This evidence was relevant to establish both why Helms was fired and why Ey had a reasonable belief that it was because of racial discrimination. Evans v. Kansas City, Missouri School District, 65 F.3d 98, 100 (8th Cir. 1995), cert denied 116 S.Ct. 1319 (1996) (retaliatory discharge plaintiffs can show they engaged in protected conduct by opposing employer practices based on a reasonable belief of discrimination); Estes v. Dick Smith Ford, 856 F.2d 1097, 1103 (8th Cir. 1988) (evidence of employer's racial bias permits inference of racial discrimination in employment decision). It was therefore appropriate to consolidate these claims and avoid the inefficiency of separate trials involving related parties, witnesses, and evidence.

Adam's Mark argues that consolidation allowed the MHRA claims to be tried to a jury when they could not have been in state court. The availability of a jury trial is a question of federal law, however, even when state claims are being tried. Gipson v. KAS Snacktime Co., 83 F.3d 225, 230 (8th Cir. 1996). Because MHRA permits the recovery of money damages, it is considered a traditional legal action for which a jury trial is available in federal court. Id. In the circumstances here where Helms and Ey sought money damages, a jury trial of both their federal and state law claims was not improper. Id.

Finally, Adam's Mark challenges the district court's failure to bifurcate the issues of liability and punitive damages since Missouri law permits separation upon request by either party. See Mo. Stat. Ann. §510.263(1). The federal rules govern all civil actions tried in federal court, however, and they control over conflicting state law. Fed. R. Civ. P. 1.; Hanna v. Plumer, 380 U.S. 460, 473-474 (1965). Consolidation of issues and claims is committed to the discretion of the trial court. Fed. R. Civ. P. 42(a). The evidence of racially discriminatory conduct was relevant on issues of liability, Estes, 856 F.2d at 1103, racial animus of managers, and punitive damages, Burnett v. Griffith, 769 S.W.2d 780, 787 (Mo. banc 1989). Adam's Mark was therefore not prejudiced by admission of such evidence in a single proceeding, and the district court did not abuse its discretion in declining to bifurcate the issues.

## III.

Adam's Mark asserts that it is entitled to a new trial because of erroneous evidentiary rulings. We review a district court's evidentiary rulings for abuse of discretion, and a new trial should only be granted on the basis of incorrect rulings if it would be likely to produce a different outcome. Campbell v. Vinjamuri, 19 F.3d 1274, 1276 (8th Cir. 1994).

*A.*

Adam's Mark complains that hearsay and irrelevant evidence was admitted. A timely and specific objection is necessary for a successful evidentiary appeal in the absence of plain error. Fed. R. Evid. 103. Bruce Ey testified without objection about several statements made by Adam's Mark managers. There was no objection raised to his testimony that Maurice Briquet told him "they want me to get rid of Dewey"; that Fred Kummer said Chestnut's was getting "too dark" because Helms was hiring too many blacks; or that Robert Schultz, another mid-level manager, told him that Anton Piringer, the president of the hotel, made such a statement about Chestnut's. Guest

services manager Donna Killion also testified that she heard Piringer express this concern about too many black employees in Chestnut's, and no objection was made. Schultz testified that Briquet said that having two blacks in the employment office would drive away white applicants, but Adam's Mark did not object until after several questions were answered and never moved to strike the previous testimony.

The failure to make timely objections precludes Adam's Mark from now challenging this testimony since its admission was not plain error, but these statements were admissible even over objection. The testimony was relevant to establish that racial bias on the part of management was the actual motive for discharging Dewey Helms, Estes, 856 F.2d at 1103, and that it was not unreasonable for Bruce Ey to refuse to carry out the termination because of a belief that the decision was racially motivated, Evans, 65 F.3d at 100. The statements were not hearsay because they were made in the course of employment by Adam's Mark managers with authority for management and employment decisions. Fed. R. Evid. 801(d)(2).

Adam's Mark also challenges several statements to which it did make timely hearsay objections. Bruce Ey testified that Mike Hess said Kummer's policy was to exclude blacks from positions at the hotel which had "the" as part of their title (the general manager, the director of personnel, etc). Donna Killion testified that her immediate supervisor told her to hire only "older black gentlemen" as doormen because that was what Kummer wanted. Paul Nicoloro testified that Kummer did not like blacks and that Briquet had said Kummer feared Helms would hire too many. Nicoloro also testified that Kummer did not want a black woman working in the hotel flower shop. These statements were not inadmissible. Fred Kummer was the controlling figure in the running of the hotel, and all aspects of the operation including personnel decisions were within the scope of his authority. The fact that some of the statements came through multiple declarants does not matter so long as the test for double hearsay is met. Fed. R. Evid. 805. This testimony all involved statements by Adam's Mark

-8-

agents regarding activities within the scope of their employment and is therefore admissible. Fed. R. Evid. 801(d)(2).

Statements attributed to Maurice Briquet were properly admitted under this same rationale. Killion testified that Briquet told her it was hotel hiring policy to exclude black waitresses from a hotel bar known as AJ's and that "black music" should not be played there.[2] These statements dealt with bar operations, a matter within Briquet's authority as general manager of the hotel. Moreover, not all of the statements fit the rule's definition of hearsay where they were not offered for the truth of the matter asserted, but rather only to show that the statements were made. Fed. R. Evid. 801(c).

Killion's testimony that Briquet had said that Dewey Helms would not be promoted because the corporate office did not want a black to be assistant personnel director was objected to both as hearsay and for lack of attribution. Briquet's attribution to "the corporate office," however, was sufficient for admission where the original speaker's identity can be inferred from the context. See Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 631-632 (7th Cir. 1996). Other testimony showing Kummer's controlling method of operating and the racially biased statements directly linked to him would have permitted the jury to infer that this statement was made by him.

With the exception of several statements attributed to Briquet, all of this testimony about comments made by managers was properly admitted. Evidence that Briquet referred to his co-worker Fred Hamileh as a "camel jockey" and made anti-

---

[2]Appellant also objected to Michael Westerfield's testimony that, while he was the manager of AJ's, food and beverage director Joe Dennehy told him the bar was getting "too dark" and to avoid black liquor and music and to Angela Bilkey's testimony that one of her supervisors in hotel security instructed her to monitor black employees very carefully. We have considered the objections raised to this testimony and find them to lack merit.

semitic statements should have been excluded because it was not directly relevant to the issues in this case. Fed. R. Evid. 402, 403. Admission of these statements in the course of a three week trial with a great volume of evidence was harmless, however. Its impact would not have been great, and it cannot be said that it would have affected the outcome. Campbell, 19 F.3d at 1276.

*B.*

Adam's Mark also objects to the admission of Exhibit 94, a chart which summarized a number of employment application files at the hotel which had defects such as incomplete information, unexplained gaps in employment histories, and no reference checks. These files had been prepared by employees other than Helms and contained the same types of deficiencies as those which were cited as a reason to terminate him. Adam's Mark objects that this summary is improper because it did not merely summarize documents, is hearsay, is not probative of pretext, and did not permit proper cross examination because the underlying files were not produced at trial.

The primary objection made to Exhibit 94 is that it expresses the conclusion of the preparer, JoEllen McDonald, rather than summarizing other documents. McDonald testified at trial about how the exhibit was created. She and several assistants examined almost two hundred employment application files for the period preceding Helms' termination and looked for the types of problems cited by management. She then summarized on the exhibit the objective data taken from the hotel files. The exhibit also cited those applications with more than one type of deficiency as having "multiple problems." Rule 1006 permits summaries of voluminous documents, and Exhibit 94 was properly admitted under that rule because its overall presentation is straightforward and accurate, rather than argumentative or conclusory. See U.S. v. Possick, 849 F.2d 332, 339 (8th Cir. 1988). It simply summarized information from the employment files under objective categories used by the hotel.

Exhibit 94 is not inadmissible under the hearsay rule. It summarized the records that were kept for all employment applications at the Adam's Mark and that were routinely completed by the person who reviewed each application. These reports underlying the exhibit were regularly kept records within the meaning of Rule 803(6) and therefore not themselves excludable as hearsay.

The argument that Exhibit 94 is not probative of pretext is also without merit. The exhibit showed that many of the employment files at the Adam's Mark had deficiencies of the sort cited for discharging Helms. The exhibit supports an inference of pretext by showing that other employees kept their files in a manner similar to Helms. The fact that only he was discharged suggested that this was not the actual reason he was fired. This is the sort of evidence that would make a reasonable trier of fact, "raise an eyebrow, and proceed to assess the employer's explanation for this outcome." MacDissi v. Valmont Industries, Inc., 856 F.2d 1054, 1058 (8th Cir. 1988).

Finally, Adam's Mark argues that it was denied the opportunity for effective cross examination because the original files were not produced at trial. Rule 1006 requires only that the documents underlying a summary be made available for copying or examination at a reasonable time and place unless otherwise ordered by the court. The originals belonged to the hotel, and the summary itself was disclosed three weeks before trial, providing ample time to compare it with the originals or to request their production in court. Having done neither, Adam's Mark cannot now complain that it was unable to cross examine effectively regarding its own files.

## C.

Adam's Mark also argues that the district court committed reversible error by excluding some of the evidence it offered. It contends that it was error to exclude evidence that Bruce Ey had stated on his employment application that he left his previous employer because his program had been terminated when in fact he left to

avoid investigation of an affair with a subordinate employee. It says this character evidence was relevant because of his claim of moral opposition to the discharge of Helms. Character is in issue only when it is an essential element of a claim or defense, however, see Advisory Committee's Note to Fed. R. Evid. 404(a), and Ey's moral character was not an essential element of his retaliatory discharge claim. The district court did not abuse its discretion in excluding this evidence as irrelevant, and it could also have been excluded under Rule 403.

Adam's Mark also argues that it was error to exclude evidence that not many African Americans were enrolled in the hotel management program at the University of Missouri in order to show there was a small number available for an applicant pool. Its offer of proof provided no indication that the number of blacks enrolled in the university hotel management program correlated to the number of black applicants for management positions at the hotel, however. Absent such a relationship the evidence lacked relevance and was properly excluded. Fed. R. Evid. 402.

## IV.

Adam's Mark claims the district court erred in denying its motion for judgment as a matter of law on the retaliatory discharge claim. Although it concedes that there was a prima facie case of racial discrimination presented in relation to Helms, it argues that Ey did not step outside his ordinary duties in opposing the discharge of Helms.

The denial of a motion for judgment as a matter of law is reviewed de novo under the same standard applied by the trial court. McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400 (8th Cir. 1994). Judgment as a matter of law is appropriate only if no reasonable jury could find for the non-moving party when viewing the evidence in its favor with the benefit of all reasonable inferences. Fed. R. Civ. P. 50(a); Ryther v. Kare-11, 108 F.3d 832, 844 (8th Cir. 1997); cert denied, 117 S.Ct. 2510 (1997). The district court properly denied the motion for judgment as a matter of law because

there was sufficient evidence produced to support a reasonable finding on each of the elements of the retaliatory discharge claim: 1) protected conduct, 2) adverse employment action, and 3) a causal connection between the two. Evans, 65 F.3d at 100.

Employers may not retaliate against employees who oppose racially discriminatory conduct. 42 U.S.C. § 2000e-3(a); Mo. Ann. Stat. §213.070. Opposition must be based on a reasonable belief that an employer has engaged in discriminatory conduct, Evans, 65 F.3d at 100, and it can include refusal to implement a discriminatory policy. Moyo v. Gomez, 32 F.3d 1382, 1385 (9th Cir. 1994) (prison guard's refusal to enforce a policy denying showers only to black inmates was protected conduct). Ey directly opposed the decision to terminate Helms based on his reasonable belief that the decision was racially motivated. This made out a claim of protected conduct.

Adam's Mark argues that Ey did not act in opposition because he did not file a claim or otherwise "step outside" his employment role. A requirement of "stepping outside" a normal role is satisfied by a showing that the employee took some action against a discriminatory policy, See McKenzie v. Renberg's, Inc., 94 F.3d 1478, 1486-87 (10th Cir. 1996); cert denied, 117 S.Ct. 1468 (1997), and that the action was based on a reasonable belief that the employer engaged in discriminatory conduct. See Evans, 65 F.3d at 100-101. Unlike the plaintiff in McKenzie who merely alerted management of potential violations of the law in order to avoid liability for the company, Ey refused to implement a discriminatory company policy. This placed him outside the normal managerial role which is to further company policy.

There was also sufficient evidence to support a finding of a causal relationship between Ey's protected conduct and his discharge. He was terminated within hours of his refusal to fire Helms. This short interlude permits an inference of causation. See Couty v. Dole, 886 F.2d 147, 148 (8th Cir. 1989) (termination within 30 days of

-13-

opposition); Keys v. Lutheran Family & Children's Services of Missouri, 668 F.2d 356, 358 (8th Cir. 1981) (less than two months); Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980) (twenty three days). The jury could readily infer that Ey's opposition to the termination of Helms caused his own discharge a day later. This inference was strengthened by evidence that Kummer ordered Ey discharged when he learned that he would not comply with the plan for Helms. Adam's Mark argues that the legitimate reasons it offered for Ey's discharge were not disproved, but a claimant need not disprove all possible reasons for his discharge. He need only offer sufficient evidence to support a reasonable inference that he was terminated for refusing to fire Helms. The fact that Adam's Mark offered evidence of a legitimate motive does not change this standard. The jury may weigh and reject such evidence as pretextual. Ryther, 108 F.3d at 844-45. So long as sufficient evidence exists to support a reasonable finding, the proper weight of the evidence and the inferences to be drawn from that evidence is left to the jury. Id. The district court did not err in denying the motion for a judgment as a matter of law on the retaliation claim.[3]

## V.

Adam's Mark also raises objections to the nature and amount of some of the relief awarded to the appellees. It objects to the size of the front pay awards, to the submission of punitive damages and the amount awarded, and to the nature and scope of the injunctive relief.

## A.

---

[3]Adam's Mark also argues that there must be an exclusive causal connection between the protected conduct and discharge, but a plaintiff must prove that retaliation was the determinative factor in firing, not that it was the only factor. See Womack, 619 F.2d at 1297 n. 7.

The district court found that Helms and Ey were entitled to five years of front pay. After hearing expert testimony on the proper method of calculating the amount, the court awarded Helms $68,239 and Ey $131,571. Adam's Mark argues that these awards were too high because it was unlikely that either Helms or Ey would have continued to work at the hotel for five years in light of the high rate of turnover in the industry and in these jobs in particular.

A district court may exercise its equitable discretion to award sufficient front pay to make a party whole when reinstatement is impractical or impossible. Newhouse v. McCormick & Co., Inc. 110 F.3d 635, 641 (8th Cir. 1997). Front pay should address equitable needs such as the ability to obtain employment with comparable compensation and responsibility, Hukkanen v. International Union of Operating Engineers, Hoisting & Portable Local No. 101, 3 F.3d 282, 286 (8th Cir. 1993), and the amount is ordinarily left to the sound exercise of discretion. MacDissi, 856 F.2d at 1060.

While the district court properly concluded that front pay was appropriate because the animosity shown between the parties made reinstatement impractical, the size of its award was greater than the evidence justified. Neither Helms nor Ey had worked at the hotel long. Helms had been there for nineteen months before his termination, and Ey for five months. The district court made no separate findings of fact on their expected tenure, but the record indicates that no one had lasted in Helms' position for more than nineteen months and the longest tenure in Ey's position was twenty six months. Both found employment elsewhere soon after leaving the Adam's Mark. Helms took the first job he was offered within four months of his discharge, as an employment technician with the State of Missouri. His compensation was almost $6000 per year less than at the hotel, and his responsibilities were much lower. Ey found temporary employment only a month after leaving the hotel, and in six months his new employer offered him a permanent position with a salary almost $25,000 more than he received at the Adam's Mark. Ey refused this offer, however, because it would

-15-

have required a permanent relocation to Rochester, New York. He then took a job as an employment counselor with the state of Missouri at an annual salary of approximately $20,000.

The amount of front pay awarded was too large because it assumes that both men would have remained at the hotel two or three times as long as any of their predecessors. The turnover in these positions was high, and an award equivalent to one year of front pay would be more appropriate, giving Helms the benefit of one year longer than any predecessor and putting Ey closer to the average range for his position.

**B.**

Adam's Mark argues that punitive damages should not have been submitted to the jury because appellees failed to demonstrate that it engaged in outrageous conduct and that the amount of punitive damages was excessive and disproportionate to any misconduct or actual damage.

Missouri law permits punitive damages when the defendant has engaged in outrageous conduct. Burnett v. Griffith, 769 S.W.2d at 787; Restatement (Second) of Torts, §908(2) (1979). The issue should be withheld from jury consideration if the plaintiffs have not produced sufficient evidence for a reasonable finding in their favor. Wright v. Over-the-Road, 945 S.W.2d 481, 489 (Mo. App. W.D. 1997).

Considerable evidence supported the submission of punitive damages to the jury. Several witnesses testified that Fred Kummer and other officials showed bias against blacks and sought to exclude them from management positions and all but the lowest level positions that were visible to the public. Testimony also showed that top managers sought to banish music and other atmospheric traits that they associated with blacks and that African American managers received lower compensation than their white counterparts. The evidence suggested that top managers acted to prevent African

Americans from rising above a certain level of employment. Hotel officials intentionally discriminated against Helms and discharged him because of his race and then discharged Ey for objecting to that decision as illegal. Retaliating against managers who oppose racial discrimination undermines the civil rights laws. These actions, many years after the laws forbidding racial discrimination became widely known, support a finding of outrageous conduct and an award of punitive damages. The district court did not err by submitting the issue to the jury.

The amount of any punitive damages awarded should be what is needed to punish and deter the defendant in addition to the compensatory award. Coleman v. Rahija, 114 F.3d. 778, 787 (8th Cir. 1997); citing Smith v. Wade, 461 U.S. 30, 54 (1983). Helms received a punitive damages award of $3,800,000 and Ey received $1,000,000. These awards must be examined in light of the twin policy aims of punishment and deterrence. Call v. Heard, 925 S.W.2d 840, 848 (Mo. banc 1996); citing Pacific Mutual Life Insurance. Co. v. Haslip, 499 U.S. 1, 19 (1991). Under Missouri law a non-exhaustive list of factors should be considered, including the severity of the defendant's misconduct, the presence of any aggravating or mitigating factors, and the financial status of the defendant. Id at 849.

The evidence of discrimination and retaliation must be considered together with the other relevant factors in considering the appropriateness of the awards. There was evidence that a policy of racial discrimination existed under the direction of high level management at the Adam's Mark, that Helms was targeted to be fired because he was black, and that Ey was terminated after refusing to fire Helms because he believed the decision was racially motivated. Deliberately restricting the opportunities of individuals on the basis of their race and punishing others for opposing that policy violates the law. Such action is misconduct that should be deterred and punished. Helms and Ey did not have a reasonable expectation of a long period of employment at the hotel, however, and both quickly found other work, even if it was less satisfying. The injunction appropriately included measures to remedy the violation of the interests protected under

-17-

the civil rights laws, and Helms and Ey were not subjected to personal harassment or other abusive treatment. The punitive damages awards amounted to five percent of the corporate parent's net worth which is a very high ratio. See Cash v. Beltman North American Co., Inc., 900 F.2d 109, 111 (7th Cir. 1990). The ratio of punitive to compensatory damages is also very high. See BMW of North America, Inc. v. Gore, 116 S.Ct. 1589, 1602-03 (1996); Haslip, 499 U.S. at 23-24. Although the MHRA does not place a ceiling on punitive damages, the jury awards substantially exceed those previously upheld under the Missouri statute: $350,000 in Kimzey, 107 F.3d at 578 (extended period of sexual harassment involving managers and constructive discharge); $15,000 in In re Estate of Latimer, 913 S.W.2d 51, 52 (Mo. App. W.D. 1995) (discharge based on handicap status); $400,000 in Kientzy, 990 F.2d at 1054 (discharge based on gender); and $125,000 in Finley v. Empiregas, Inc. of Potsoi, 975 F.2d 467, 472 (8th Cir. 1992) (failure to promote based on gender).

Missouri law provides for remittitur when a jury award exceeds what is fair and reasonable, Mo. Ann. Stat. §537.068 (West 1997), and this procedure applies to punitive damage awards as well. Mo. Ann. Stat. §510.263(6) (West 1997). Remittitur allows punitive damages to be set at an equitable amount without a time-consuming and inefficient retrial of this single issue. Fust v. Francois, 913 S.W.2d 38, 49 (Mo. App. E.D. 1995). Determining the proper amount to be remitted requires an analysis of factors identical to those used to assess the reasonableness of the award. See Moore v. Missouri-Nebraska Express, Inc., 892 S.W.2d 696, 714 (Mo. App. W.D. 1994). Consideration of these factors demonstrates that a substantial reduction in the punitive damage awards would be appropriate. A deliberate violation of well-settled law prohibiting racial discrimination and retaliation deserves both punishment and deterrence but a penalty of five percent of the corporate parent's net worth is excessive. After considering the nature and extent of the misconduct, the impact on the individual plaintiffs, a reasonable relation between the compensatory and punitive damages, and an amount sufficient to punish and deter under all the circumstances, we find an appropriate amount of punitive damages is $380,000 for Helms and $100,000 for Ey.

## C.

Adam's Mark also objects to some of the injunctive relief awarded by the district court on the Title VII claims. The court ordered Adam's Mark to expunge its employment records of all reference to the circumstances surrounding the firing of Helms and Ey and to provide both men with letters of recommendation. It permanently enjoined racial discrimination or retaliation against employees who oppose discrimination and required management to attend annual education programs on race discrimination for three years, to make an annual submission for three years to the EEOC of a statement of compliance and a report of all discipline or discharge of black employees, and to notify all employees of the scope of relief awarded. It also required appointment of a neutral monitor to oversee employment decisions at the hotel for three years. The monitor was to have full access to HBE's employment files and the power to investigate any claim of racial discrimination. Adam's Mark argues that the court went too far in requiring appointment of a neutral monitor because the described oversight and investigatory authority would go beyond the bounds of the discrimination shown in this case.

A court may exercise its discretion to fashion injunctive relief to remedy the effects of racial discrimination. Briscoe v. Fred's Dollar Store, 24 F.3d 1026, 1028 (8th Cir. 1994). That discretion is not unlimited, however, and is reviewed for abuse. Id. Provisions of an injunction may be set aside if they are broader than necessary to remedy the underlying wrong. Easly v. Anheuser-Busch, Inc., 758 F.2d 251, 263 (8th Cir. 1985).

At oral argument counsel was asked if a monitor had ever been appointed and, if not, whether court-ordered compliance had been sought. The answer to both

-19-

questions was no.[4] The fact that appellees had not pursued the matter indicates that this provision was not necessary to remedy the harm in this case. The immediate harm to Helms and Ey was remedied by the order to expunge their employment records of all reference to their discharge and to provide recommendation letters. The injunction against continued discrimination is designed to prevent similar misconduct. Appointment of a monitor would only address speculative future harm. See Easly, 758 F.2d at 263. There is no indication that any relief is necessary beyond the annual reports to the EEOC and the other provisions of the injunction. The order requiring appointment of a third party monitor was broader than necessary, and it is therefore reversed.

## D.

Finally, Adam's Mark objects to the award of attorney fees and costs. A prevailing party in a Title VII lawsuit may recover attorney fees, 42 U.S.C. § 2000e-5(k), and other litigation expenses, Pinkham v. Camex, Inc., 84 F.3d 292, 294-95 (8th Cir. 1996). Adam's Mark argues that the award should be vacated because it is entitled to judgment as a matter of law on the retaliatory discharge claim and an award to Helms would be premature before completion of the new trial it seeks. It has not challenged the reasonableness of the number of hours, hourly rate, or costs used to compute the award, however. Since Helms and Ey have prevailed on their claims they are entitled to fees, and appellant has not demonstrated that the district court abused its discretion or that the amount awarded is unreasonable. See Catlett v. Missouri

---

[4]On October 31, 1996 appellants petitioned the district court to stay enforcement of the injunction pending appeal. No action was taken by the district court until after counsel was asked at oral argument on September 8, 1997 whether a monitor had been appointed. The district court entered an order on September 12 denying the motion before it, and appellants moved on September 22 for this court to stay enforcement. That motion is now dismissed as moot.

<u>Highway and Transportation Commission</u>, 828 F.2d 1260, 1270 (8th Cir. 1987).  The award of attorney fees and costs is therefore affirmed.

## VI.

For these reasons the judgment is affirmed in all respects except for the amounts awarded for front pay and punitive damages and for that portion of the injunction which calls for appointment of a third party monitor.  We reverse the district court on these points and remand for further proceedings consistent with this opinion.

A true copy.

       Attest:

          CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.