73 F.3d 174
 Francisco A. CAMBEROS, Plaintiff/Appellee,
v.
Terry BRANSTAD, Governor of Iowa; Paul Grossheim; John
Ault; Jerry Burt, Defendants/Appellants,
John Doe(s), 1-9; Jane Doe(s), 1-9, Defendants,
Kathy Weiss; Joyce Carver; Susan Meyer, Defendants/Appellants.
 No. 95-1498.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 19, 1995.
Decided Dec. 26, 1995.
 
 Kristin W. Ensign, Asst. Atty. Gen., Des Moines, IA, argued, for appellant.
 Patrick E. Ingram, Iowa City, IA, argued, for appellee.
 Before BOWMAN, HEANEY, and WOLLMAN, Circuit Judges.
 WOLLMAN, Circuit Judge.
 
 
 1
 In this 42 U.S.C. Sec. 1983 case, the district court ruled in favor of Francisco Camberos on his Eighth Amendment claim that certain prison officials at the North Central Correctional Facility, located in Rockwell City, Iowa (North Central), were deliberately indifferent to his serious medical needs. We reverse.
 
 I.
 
 2
 Camberos, a native Spanish speaker, arrived at North Central in October 1991 with an order restricting his work because of an injured shoulder. During his eleven-month incarceration there, Camberos was seen at North Central's medical center at least twenty-six times with complaints of shoulder pain and other infirmities. Approximately 110 notes by the medical staff charted Camberos's medical complaints and noted an assessment and treatment plan. In addition to his treatment at the medical center, Camberos was referred to the Iowa City Hospital for specialized care on seven occasions.
 
 
 3
 The medical center was staffed primarily with nurses and a physician's assistant (PA). Occasionally, when the PA could not be present, a doctor saw the prison patients. If the PA thought it proper, he would refer prisoners to the Iowa City Hospital, where they would see a physician concerning the referred infirmity.
 
 
 4
 Camberos was examined by nurses and the PA at the medical center, but never by a doctor. Although at a nurse's request Dr. Paul L. Loeffelholz, the Iowa Department of Corrections Medical Director, reviewed Camberos's records to approve the course of treatment, no doctor evaluated or treated Camberos's shoulder injury until September 1992, when he was referred to an Iowa City orthopedic surgeon by an Iowa City gastroenterologist that he was seeing on a referral from the PA. The orthopedic surgeon's diagnosis was similar to that of the PA at the medical center. In addition to the TENS unit, an electrical device for pain management that Camberos was already using, the orthopedic surgeon provided Camberos with wrist splints to wear during periods of heavy activity and at night, noting that such use previously had been successful in reducing the numbness in Camberos's hands. The orthopedic surgeon also referred Camberos to the shoulder clinic for an evaluation.
 
 
 5
 Camberos contends that he should have been permitted to see a doctor concerning his shoulder earlier in his incarceration. In addition, he argues that had he been able to communicate effectively with the medical center personnel, he could have explained that he needed the wrist splints taken from him prior to his transfer to North Central.
 
 II.
 
 6
 To support his section 1983 claim, Camberos must show that the defendants were deliberately indifferent to his serious medical needs. Such a showing is necessary to establish the " 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (internal citation omitted).
 
 
 7
 We have defined a serious medical need as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Johnson v. Busby, 953 F.2d 349, 351 (8th Cir.1991) (upholding jury instruction that used this language). The district court found that Camberos's shoulder injury, having been treated by a doctor prior to his incarceration, constituted a serious medical need. Accepting this finding, we move on to determine whether the various defendants displayed deliberate indifference toward that injury.
 
 
 8
 The potential liability of defendants Burt and Ault is limited to the alleged failure to facilitate proper communication between Camberos and the medical staff. Burt is the treatment director at North Central, and Ault is the warden. The district court acknowledged that under Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir.1987), a general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability. Moreover, because Burt and Ault lacked medical expertise, they cannot be liable for the medical staff's diagnostic decision not to refer Camberos to a doctor to treat his shoulder injury. See Crooks v. Nix, 872 F.2d 800, 803 (8th Cir.1989).
 
 
 9
 Consequently, the district court's finding of liability rested solely on the theory that Burt and Ault's failure to investigate Camberos's communication problems and provide him with an interpreter to assist in his medical visits amounted to deliberate indifference. This finding is based both on the factual determination that Camberos required assistance to effectively communicate with the medical staff and on the legal determination that defendants' actions rose to the level of deliberate indifference.
 
 
 10
 We review the district court's findings of fact under the clearly erroneous standard and its conclusions of law de novo. Paramount Pictures Corp. v. Metro Program Network, Inc., 962 F.2d 775, 777 (8th Cir.1992). Having reviewed the record in light of this standard, we are persuaded that the district court erred in its factual determination concerning Camberos's ability to communicate in English. In finding that Camberos's English was inadequate to communicate with medical personnel, the district court primarily relied on two pieces of evidence: a report documenting that Camberos was not given the regular prison entrance exams and a letter written by prison educational assistant Mary Kaskey. We find this reliance to be misplaced.
 
 
 11
 The district court stated that Camberos was not given the entrance exam because he "could not understand English well enough to take the tests." The exam, however, was written, and Camberos's entrance report identifies the reason for not administering the test as his "low reading level of English." The report, however, casts no light on Camberos's ability to understand or speak English, and thus it provides little assistance in ascertaining his ability to communicate with medical personnel.
 
 
 12
 The court's reliance on Kaskey's evaluation of Camberos's English abilities is equally unpersuasive. In an undated letter written to an unidentified individual, Kaskey wrote that when Camberos first entered North Central, he "could not understand nor speak much English." The letter's credibility is cast into doubt by its missing date and unknown recipient, and by Burt's testimony that at the time of trial Kaskey was no longer working at North Central because of difficulty in maintaining a professional distance from the inmates.
 
 
 13
 In addition, the record belies the statement that Camberos could not speak or understand much English at the time of incarceration. At his plea and sentencing proceedings Camberos, without the aid of an interpreter, stated repeatedly that he understood the proceedings against him. At one point during the sentencing proceedings, when asked about his arm injury, Camberos answered, "I cut three tendons in my left hand and I got carpel tunnels in my right hand." He went on to state that he wore a "TENS unit" to "kill the pain." This testimony is flatly inconsistent with the theory that Camberos "could not speak or understand much English."
 
 
 14
 In support of its finding that Camberos's English skills were limited, the district court noted that during Camberos's plea hearing his lawyer requested the court to slow down. Following one of the court's inquiries into whether Camberos understood the proceedings, his lawyer responded, "He understands English, but if the Court goes a little slower." This evidence establishes that Camberos's mastery of the language is not absolute, not that he does not speak or understand English.
 
 
 15
 The district court further relied on the fact that at times the nurses gave Camberos written instructions as evidence that Camberos did not understand their verbal instructions. Nurse Weiss testified that she gave written instructions listing medications and procedures so that an interested patient could look them up in a medical book. This practice evidences conscientious nursing care, not deficient communication.
 
 
 16
 In sum, then, the record as a whole compels a finding that Camberos was able to communicate effectively with the medical staff. The nurses testified that they had no difficulty communicating with Camberos in English and that at no time did he attempt to speak Spanish with them. In her deposition, Nurse Carver stated that Camberos was allowed to bring a Spanish-speaking inmate to assist him in one consultation, but that she felt the interpreter provided no additional help. Burt and Ault testified that they communicated effectively with Camberos in English. Moreover, Camberos's wife and children speak English. Prior to his conviction and incarceration, Camberos had worked in this country as a field hand and at a John Morrell meat packing plant.
 
 
 17
 In the light of the record evidence, we hold that the district court's finding regarding Camberos's English-speaking ability is clearly erroneous. Accordingly, we reverse the finding of liability against defendants Burt and Ault.
 
 III.
 
 18
 The district court held that the remaining defendants, Nurses Kathy Weiss, Joyce Carver and Susan Meyer, were deliberately indifferent to Camberos's medical needs in failing to refer him to a doctor despite his repeated complaints of shoulder and arm pain over an eleven-month period. We find no deliberate indifference on the part of these defendants.
 
 
 19
 The record shows that the nurses at North Central lacked the authority to refer a patient to a doctor at the Iowa Medical Center. If the nurses thought a medical problem required further treatment, they had two options. First, they could refer the patient to the PA or doctor, whichever happened to be on duty. Camberos was referred to the PA numerous times. That Camberos never saw a doctor at North Central was mere happenstance. The nurses had no control over whether a doctor or a PA was the superior on duty at any particular time. The nurses also took the second step authorized when they suspect a patient may need additional attention. They suggested that Dr. Loeffelholz, the medical director, look at Camberos's file to ensure that he was receiving appropriate treatment.
 
 
 20
 Furthermore, the record shows that the nurses listened to and painstakingly chronicled Camberos's numerous medical complaints. In addition to his shoulder pain, during his short incarceration Camberos complained of blurry vision, scratched glasses, rashes on various parts of his body, stomach disorders, vomiting, and a cold and sore throat. On a single day, Camberos presented the following ailments: "I still vomit, stomach burns.... My vision is blurry, I need to see an eye doctor, My glasses are scratched.... When can I see a dentist, I have a toothache. My shoulder still hurts...." Notwithstanding this barrage of complaints, the nurses appear to have conscientiously evaluated each problem. Camberos was often referred to the PA on duty, and seven times he was sent to the Iowa City Hospital for further treatment. In light of this thorough care, we conclude that there is insufficient evidence to support a finding of deliberate indifference to any of Camberos's medical needs.
 
 
 21
 The judgment is reversed, and the case is remanded with directions to dismiss the complaint.
 
 
 22
 HEANEY, Circuit Judge, dissenting.
 
 
 23
 I respectfully dissent from the majority's opinion that the district court's finding that Camberos should be permitted to recover from defendant nurses Weiss, Carver and Meier was clearly erroneous.
 
 
 24
 The district court heard the conflicting testimony regarding Camberos's ability to describe the pain that he was experiencing and it had the opportunity to observe Camberos and his communication skills first hand. It also had evidence before it that Camberos experienced pain in his arm for more than eleven months before he was seen and properly attended to by a doctor. The district court's finding that Camberos needed an interpreter and that he should have been referred to a doctor should not be disturbed. In light of its factual findings, the district court was correct in concluding that the nurses violated Camberos's Eighth Amendment rights. See Johnson-El v. Schoemehl, 878 F.2d 1043, 1055 (8th Cir.1989) (delay in the provision of treatment or examinations of an inmate's medically serious or painful ailments may constitute an Eighth Amendment violation). I would therefore affirm the district court's decision to award Camberos $2,000 for the pain he suffered over a ten-month period.
 
 
 25
 From the time he was admitted to North Central in October of 1991, Camberos persistently complained to the nurses with respect to his arm and shoulder pain. For whatever reason, the nurses paid little or no attention to his complaints; either they failed to understand what he said or they did not care what he said. Eight months after Camberos was admitted to North Central, a physician's assistant referred him to a doctor in Iowa City for his pain. This referral came only after an Iowa City doctor, who saw Camberos on an unrelated matter, advised him that his arm needed medical care. Eleven months after his original complaints, Camberos was seen by a specialist at the University of Iowa and received proper care for his pain. Because of their significant delay in referring Camberos to a doctor, the nurses were deliberately indifferent to his serious medical needs.
 
 
 26
 When seeking medical treatment for his arm and shoulder pain, Camberos requested at least twice to have an interpreter provided for him. According to Dr. Loeffelholz, the Medical Director for the Department of Corrections, several Spanish-speaking people were available at the facility, but Camberos's requests were denied.
 
 
 27
 The district court had an opportunity to observe Camberos and its finding that Camberos could not adequately communicate in English with medical personnel at North Central and that he should have been provided with an interpreter must be sustained. Camberos was born and raised in Mexico and he completed the eighth grade while still in his native country. He apparently took two years of English classes after he came to the United States, but attended no further schooling in this country. Although the majority questions the credibility of Kaskey's evaluation of Camberos's English abilities, they ignore another letter in the record, dated and signed by three G.E.D. instructors. The letter states that as of August 12, 1992, after working with an English as a Second Language (ESL) tutor for eight months, Camberos's English comprehension was at a fourth or fifth grade level. As can be expected there is some evidence in the record that Camberos could communicate in English and could understand some English. The record as a whole, however, supports the district court's finding that Camberos either could not convey his medical needs to the nurses at North Central or that the nurses paid no attention to what he said.
 
 
 28
 Perhaps the strongest indication that Camberos should have been provided an interpreter all along is from the treatment he finally received at the University of Iowa when examined by a physician in the presence of an interpreter. The physician was able to take a thorough medical history of Camberos. He then gave Camberos an orthopedic examination and noted his impressions of Camberos's medical condition, two of which had not been recognized by the North Central personnel. As Dr. Loeffelholz admits, these impressions were not made before because of the level of practitioners who had assessed Camberos's condition at North Central. The University physicians recommended that Camberos wear wrist-splints during periods of heavy activity and at night, referred him to the Shoulder Clinic at the University Hospital, and stated that if his pain persists, Camberos's condition should be reevaluated.
 
 
 29
 No reason is shown in this record why Camberos was not seen by a physician prior to September of 1992. As nurse Weiss testified, the nurses had the authority to refer Camberos to either a physician's assistant or a doctor, whoever was present in the clinic on the given day. Camberos saw a physician's assistant several times while at the facility, but never a doctor. Weiss also testified that the nurses could contact Dr. Loeffelholz if he or she felt that a physician's assistant should have referred Camberos to a doctor. Despite Camberos's continued pain, none of the nurses made such a recommendation to Dr. Loeffelholz; rather they requested that Dr. Loeffelholz review Camberos's medical records, which only led to the reduction of Camberos's ability to seek medical attention at the facility.
 
 
 30
 While there was more than sufficient evidence in the record to support the district court's decision with respect to the defendant nurses' liability, I agree with the majority that Camberos failed to establish personal involvement by defendants Ault or Burt in the deliberate indifference to his medical needs. As warden and treatment director of North Central respectively, Burt and Ault lacked the necessary expertise for and were too far removed from the decisions made in this case to be held responsible for them. Accordingly, I concur in the majority's decision to reverse the district court's decision in this regard.