Roy JAUNDOO, Plaintiff,

v.

Harold CLARKE, et al., Defendants.

Civil Action No. 08–10977–JLT.

United States District Court,
D. Massachusetts.

March 28, 2011.

James A. Bello, Jeffrey W. Ward, Morrison, Mahoney LLP, Stephen G. Dietrick, MA Department of Correction, Boston, MA, for Defendants.

Brandon L. Bigelow, Carolyn B. French, James C. McGrath, Thomas Peter R. Pound, Bingham McCutchen LLP, Boston, MA, for Plaintiff.

## ORDER ON REPORT AND RECOMMENDATIONS

JOSEPH L. TAURO, District Judge.

This court ACCEPTS and ADOPTS the March 14, 2011 Report and Recommendation [81] of Chief Magistrate Judge Dein. For the reasons set forth in the Report and Recommendations, this court hereby orders the following: Motion for Summary Judgment [65] is ALLOWED IN PART and DENIED IN PART. It is ALLOWED with respect to Mark Waitkevich and DENIED with respect to Rosalie Berry. Motion for Summary Judgment [70] is DENIED. IT IS SO ORDERED.

## *REPORT AND RECOMMENDATION ON DEFENDANTS MOTIONS FOR SUMMARY JUDGMENT*

DEIN, United States Magistrate Judge.

## I. *INTRODUCTION*

At all relevant times, the plaintiff Roy Jaundoo ("Jaundoo") was incarcerated at the Massachusetts Correctional Institution at Cedar Junction. By his First Amended Complaint (Docket No. 54) ("Compl."),[1] Jaundoo asserts that Corrections Officer John Kearnan, and the UMass Correctional Health ("UMCH") defendants, Health Services Administrator Mark Waitkevich and Nurse Rosalie K. Berry, are liable under 42 U.S.C. § 1983 for deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution. According to Jaundoo, as a result of the defendants' actions he was prematurely deprived of crutches he needed for a torn patellar tendon in his left knee, and he consequently fell again, suffering a severe fracture of his left patella and requiring further surgery.

This matter is before the court on Waitkevich's and Berry's joint motion for summary judgment (Docket No. 65) and on Kearnan's motion for summary judgment (Docket No. 70). For the reasons detailed below, this court recommends to the District Judge to whom this case is assigned that Kearnan's and Berry's motions be DENIED and that Waitkevich's motion be ALLOWED.

## II. *STATEMENT OF FACTS*[2]

The following facts relevant to the defendant's motion are undisputed unless otherwise indicated.

---

1. On February 22, 2010, the District Judge adopted this court's Report and Recommendation on Plaintiff's Motion for Leave to Amend (Docket No. 51) and thereby allowed Jaundoo to file a First Amended Complaint raising some, but not all, of the claims he had originally proposed to file.

2. The facts are derived from the following: (1) Statement of Material Facts in Support of the Motion for Summary Judgment of Defendant John Kearnan ("DF") (Docket No. 71); (2) exhibits 1–5 attached to Statement of Material Facts in Support of the Motion for Summary Judgement of John Kearnan ("Def. Ex. ___") (Docket Nos. 71–2 to 71–6); (3) Affidavit of John Kearnan ("Kearnan Aff.") (Docket No. 71–1); (4) Defendants, Mark Waitkevich and Rosalie Berry, NP's, Statement of Material Facts in Support of Their Motion for Summary Judgment ("UMCH DF") (Docket No. 66); (5) exhibits 1–25 attached to Defendant, Mark Waitkevich and Rosalie Berry, NP's, Memorandum in Support of Their Motion for Summary Judgment ("UMCH Ex. ___")

The plaintiff, Roy Jaundoo, was at all relevant times incarcerated at the Massachusetts Correctional Institution at Cedar Junction ("MCI–Cedar Junction"). (DF ¶ 1; PR ¶ 1).[3] On June 18, 2007, Jaundoo ruptured the patellar tendon of his left knee while playing basketball after he was hit by two other individuals. (UMCH DF ¶ 8; PR ¶ 8). Jaundoo received crutches after the incident. (UMCH DF ¶ 9; PR ¶ 9).

The day after his injury, Jaundoo was referred to the orthopedic clinic at Lemuel Shattuck Hospital ("LSH"). (UMCH DF ¶ 10; PR ¶ 10; PAF ¶ 2). Doctors at LSH recommended that Jaundoo's tendon be surgically repaired, and Jaundoo underwent surgery on June 20, 2007. (UMCH DF ¶¶ 10–11; PR ¶¶ 10–11).

On June 27, 2007, Jaundoo was discharged from LSH and returned to MCI–Cedar Junction where he was housed in the Health Services Unit ("HSU") for post-operative observation and care. (UMCH DF ¶ 12; PR ¶ 12). On July 5, 2007, Jaundoo had a follow-up appointment at LSH. (UMCH DF ¶ 14; PR ¶ 14). Dr. Adriana Carrillo apparently oversaw Jaundoo's treatment at LSH. (See LSH Ortho. Consult Rep. dated July 5, 2007, UMCH Ex. 5). Jaundoo was using a knee immobilizer at this time and was advised to remain non-weightbearing on his injured knee and to walk with crutches. (Id.; UMCH DF ¶ 14; PR ¶ 14).

Jaundoo had another follow-up appointment at LSH on August 14, 2007. (DF ¶ 15; PR ¶ 15). At this appointment, medical staff noted that Jaundoo's range of motion had improved and provided Jaundoo with a "Bledsoe brace." (UMCH DF ¶ 15; PR ¶ 15).[4] Jaundoo was also instructed on how to strengthen his quadricep muscles. (Id.). Jaundoo was instructed to "remain non weightbearing" on his left leg, but the medical notes make no reference to crutches. (UMCH Ex. 6). Jaundoo did continue to use his crutches.

On September 6, 2007, Jaundoo had another follow-up appointment at LSH. (UMCH DF ¶ 16; PR ¶ 16). The orthopedic consult report from this visit states that Jaundoo can "start weightbear to tolerance." (LSH Ortho. Consult Rep. dated Sept. 6, 2007, UMCH Ex. 7). Again, there is no reference to crutches in the medical notes, although it is undisputed that Jaundoo was continuing to use the crutches. According to Dr. Carrillo, "tolerated ambulation" means that a patient can put weight on his leg if it does not produce pain. (PAF ¶ 4; Carrillo Tr., Pl. Ex. A at 42:16–21). If the patient experiences pain, the patient may put weight on his leg but "just not enough to produce the pain." (Id.).

(Docket No. 67) as verified by the Affidavit of Jeffrey W. Ward, Esq. (Docket No. 68); (6) Plaintiff's Consolidated Response to Defendants' Local Rule 56.1 Statements of Material Facts ("PR") (Docket No. 75); (7) Plaintiff's Additional Statement of Material Facts ("PAF") beginning on page 10 of Plaintiff's Consolidated Response to Defendants' Local Rule 56.1 Statements of Material Facts (Docket No. 75); and (8) exhibits A–N attached to Plaintiff's Affidavit of Carolyn B. French ("Pl. Ex. ___") (Docket Nos. 76–1 to 76–14).

3. The Plaintiff's Response ("PR") addresses UMCH's statement of facts in Section I, and Sgt. Kearnan's statement of facts in Section II. The paragraph numbers are the same in both sections. Therefore, the reference to "PR" is to the section addressing the cited defendant's statement of facts.

4. A "Bledsoe brace" is an orthopedic knee brace that allows a doctor to control the range of motion of a patient's knee to prevent the knee from being bent in an uncontrolled manner. (See PAF ¶ 3; Carrillo Tr., Pl. Ex. A at 22:12–24).

On September 10, 2007, Jaundoo received a referral for physical therapy. (UMCH DF ¶ 17; PR ¶ 17). On October 4, 2007, Jaundoo had another appointment at LSH. (UMCH DF ¶ 19; PR ¶ 19). The medical report for this visit was not signed by Dr. Carrillo until October 16, 2007. (*See* UMCH Ex. 10). According to the medical report, Jaundoo had started physical therapy, but his "quads continue to appear atrophied." (*Id.*). The report further provides that "[w]hat we will do today is now increase his weight-bearing status to full weightbearing but I do ask that he maintain the Bledsoe brace for protection." (*Id.*). Under "recommendation," it is stated that "[p]hysical therapy can advance this patient to full weightbearing and start straight-leg raises." (*Id.*). The report makes no reference to crutches, but it is undisputed that Jaundoo remained in possession of his crutches. According to Dr. Carrillo, a patient may still need to use crutches during the "full weightbearing" phase of rehabilitation. (PAF ¶ 6; Carrillo Tr., Pl. Ex. A at 52:9–15).

### Incident with Corrections Officer Kearnan

On October 11, 2007, Jaundoo was playing poker with other inmates in the day room at MCI–Cedar Junction. (UMCH DF ¶ 24; PR ¶ 24). During the game, Jaundoo saw the Recreation Officer and went across the room to talk to him without the use of his crutches. (UMCH DF ¶ 25; PR ¶ 25). Jaundoo was still wearing the Bledsoe brace on his injured knee at the time. (DF ¶ 9; PR ¶ 9). The parties dispute whether Jaundoo ran without his crutches or hopped on his uninjured leg. (*Compare* DF ¶¶ 6, 10 *with* PR ¶¶ 6, 10).

Kearnan claims in his affidavit that he saw Jaundoo "run several feet." (Kearnan Aff. ¶ 6). Jaundoo, in his deposition testimony, claims to have hopped across the room. (Jaundoo Tr., Pl. Ex. B at 66:18–67:13). At this juncture, this court must take as true Jaundoo's claim that he hopped across the day room on his uninjured leg to avoid putting weight on the injured one.

After witnessing Jaundoo move across the day room, Kearnan asked Jaundoo where his crutches were. (DF ¶ 11; PR ¶ 11). The parties then exchanged words, which are now in dispute. (*Compare* DF ¶¶ 12–13 *with* PR ¶¶ 12–13). Kearnan claims that Jaundoo said he did not need his crutches to "run, hop, or fight." (Kearnan Aff. ¶ 9). Jaundoo claims that he told Kearnan to "go find some business." (Jaundoo Tr., Pl. Ex. B at 68:14–69:4). It is undisputed that Jaundoo spoke to Kearnan disrespectfully. (*See* Pl. Opp. (Docket No. 74) at 14).[5]

### Kearnan's Report of the Incident

Kearnan wrote an incident report immediately after his exchange with Jaundoo reporting that he had seen Jaundoo run without his crutches and that Jaundoo had stated that he didn't need his crutches to "run, hop, or fight." (DF ¶¶ 14–15; PR ¶¶ 14–15; Def. Ex. B). According to the report, the incident was also reported to the shift supervisor and the Director of Nursing. (Def. Ex. B). Kearnan now contends that he reported the incident to his immediate supervisor, the corridor lieutenant, who, in turn, was to report to the shift supervisor. (DF ¶ 17; PR ¶ 17). At the time, Kearnan's supervisors were, in increasing order of their authority, the corri-

---

5. The defendants also contend that Jaundoo admitted in a Grievance he filed that he said he didn't need his crutches "to hop or fight" (with no mention of "run"). (*See* UMCH Ex. 20). However, it is unclear whether Jaundoo is merely repeating the defendants' claim in his Grievance or admitting he made that statement. The record is clear that Jaundoo is now denying making any such statement and that Jaundoo never affirmatively stated that he did not need his crutches to get around generally.

dor lieutenant, the shift commander, the director of security, the deputy superintendent, and the superintendent. (DF ¶ 2; PR ¶ 2).

Kearnan then had a face-to-face conversation with Director of Nursing, Jeffrey Fisher.[6] (DF ¶ 19; Pl. Opp. 6). Kearnan relayed the information contained in the incident report, which included that Kearnan had observed Jaundoo running without crutches. (DF ¶ 19; Kearnan Aff. ¶ 16). After speaking with Fisher, Kearnan did not speak with other prison officials about the incident. (DF ¶ 22; PR ¶ 22). Nor was he present when, as detailed *infra*, Jaundoo's crutches were removed. (DF ¶¶ 24–25; PR ¶¶ 24–25).

Fisher brought a copy of Kearnan's incident report and Jaundoo's medical records to defendant Berry, who was the Nurse Practitioner on duty. (UMCH DF ¶ 30; PR ¶ 30). Fisher also told Berry that Jaundoo had been seen running without his crutches. (UMCH DF ¶ 31; PR ¶ 31).

### Discontinuation of Crutches

On October 12 or 13, 2007,[7] Jaundoo was escorted to the HSU after he refused to surrender his crutches to prison officials. (UMCH DF ¶ 33; PR ¶ 33; Jaundoo Tr., Def. Ex. 9 at 51:2–56:12). When Jaundoo arrived at the HSU, he was told that he had to turn over his crutches. (UMCH DF ¶ 34; PR ¶ 34). Jaundoo told the nurse at the HSU that he needed his crutches because he was unable to walk without them and was still undergoing physical therapy. (PAF ¶ 17; Jaundoo Tr., Pl. Ex. B at 60:1–8). The officer who escorted Jaundoo to the HSU told Jaundoo that he "needed to give the crutches up and deal with [getting them back] at a later time with [the] medical staff." (PAF ¶ 18; Grimes Tr., Pl. Ex. D at 32:4–15).

The order to discontinue the crutches was made by defendant Berry. (UMCH DF ¶ 35; PR ¶ 35). Dr. Carrillo had not ordered that Jaundoo's crutches be discontinued at the time that Berry ordered them removed. (PAF ¶ 12; Carrillo Tr., Pl. Ex. A at 58:21–59:9). At her deposition, Berry testified that she could not recall reviewing Jaundoo's medical records (although it would have been her practice to do so), meeting Jaundoo, or examining him or his knee before ordering the crutches be discontinued. (*See* PAF ¶ 13; Berry Tr., Pl. Ex. C at 30:22–31:4, 36:19–22, 58:18–59:1). As detailed above, if Berry had reviewed Jaundoo's records, the last report would have reflected the September 6, 2007 visit to LSH, which stated that Jaundoo could "start weightbear to tolerance." (UMCH Ex. 7). The orthopedic consult report relating to Jaundoo's October 4, 2007 visit to LSH was not signed until October 16, 2007, and, therefore, would not have been available for review. (PAF ¶ 10; Berry Tr., Pl. Ex. C at 51:2–52:22).

Berry testified at her deposition that there are circumstances in which it is not necessary to perform a physical examina-

---

**6.** At oral argument, Kearnan argued that this interaction was happenstance based on the proximity of Director Fisher's office to Kearnan's office. Regardless of whether such a fact would be material, this court has not been pointed to or independently found evidence in the record to support this assertion. Director Fisher stated "I don't know exactly how I came across talking to Mr. Kearnan" when asked in deposition. (Fisher Tr., UMCH Ex. 14 at 38:15–19).

**7.** The parties dispute which day this incident occurred on, but there is no support in the record for defendants' statement that it occurred on October 14, 2007 as they claim in UMCH DF ¶ 33. (*See* Jaundoo Tr., UMCH Ex. 9 at 51:2–5; Grievance dated Oct. 14, 2007 referencing event of Oct. 13, UMCH Ex. 19).

tion before discontinuing crutches, including when she had sufficient information from the nursing staff to feel comfortable discontinuing an inmate's crutches. (UMCH DF ¶¶ 36–37; PR ¶¶ 36–37). Dr. Carrillo, however, testified that she "usually" conducts a physical exam of a patient in assessing whether a patient continues to need crutches. (*See* PAF ¶ 11; Carrillo Tr., Pl. Ex. A at 67:13–24).

Jaundoo contends that Berry did not have any information from the nursing staff to justify removal of his crutches. Moreover, he contends that Berry did not have the authority to discontinue crutches prescribed by an orthopedic specialist. Specifically, pursuant to her practice agreement, Berry was permitted to diagnose, treat, and evaluate medical conditions, which includes "initiating and/or revising medical regimens" but the agreement makes no specific reference to the use of crutches. (UMCH DF ¶ 38; PR ¶ 38; Guidelines for Practice, UMCH Ex. 17 at § 2(E)(7)). Berry testified that she believed she had the authority to discontinue the use of an inmate's crutches. (Berry Tr., Pl. Ex. C at 34:3–34:18). On the other hand, Berry did concede that she did not believe it appropriate for an on-site supervising physician to discontinue a patient's crutches if prescribed by an outside, consulting orthopedic doctor. (PAF ¶ 14; Berry Tr., Pl. Ex. C at 56:5–58:7). Moreover, under Department of Correction guidelines now in effect, the contractual physician of a prison facility must note the "specific reasons" why he is departing from a treating consultant's recommendations in a patient's files. (PAF ¶ 15; Mass. DOC Regulations, Medical

Services, 103 DOC 630.12(4), Pl. Ex. K).[8] No such description was included in Jaundoo's file.

### Events After Discontinuation of Crutches

After Jaundoo's crutches were taken away on October 13, 2007, he was unable to walk on his own and another inmate assisted him in returning to his cell from the HSU. (PAF ¶ 19; Jaundoo Tr., Pl. Ex. B at 62:17–63:24). On October 14, Jaundoo filed a sick call request form complaining of a sharp pain in his left leg. (UMCH DF ¶ 40; PR ¶ 40; UMCH Ex. 18 at p. 1). He filed another sick call request form on October 15, 2007 complaining of sharp pain in his left knee and asserting that his knee had given out that day. (UMCH Ex. 18 at p. 2). On October 14, 2007, Jaundoo also filed a Grievance complaining of being denied his prescribed medical treatment, *i.e.*, his crutches. (UMCH Ex. 19). The Grievance was received on October 16, 2007 and referred to the Health Service Administration ("HSA"). (*Id.*). On October 18, 2007, Jaundoo fell, causing a fracture of his left patella, the same knee that he had originally injured. (UMCH DF ¶ 42; PR ¶ 42).[9] Jaundoo underwent surgery to repair the fractured patella on October 24, 2007. (UMCH DF ¶ 43; PR ¶ 43). In the discharge report, Dr. Carillo noted that the surgery was difficult due to the prior surgery and stated "[w]hy the crutches were removed from this patient is unknown to us. . . ." (Pl. Ex. G).

### Waitkevich's Oversight as Health Services Administrator

Defendant Waitkevich was the Health Services Administrator ("HSA") at MCI–

---

**8.** The parties disagree whether this regulation was in effect at the relevant time.

**9.** The parties disagree over whether the fall occurred inside the shower or outside the

shower while the plaintiff was preparing to enter. (*Compare* UMCH DF ¶ 42 *with* PR ¶ 42). This fact is not material at this juncture.

Cedar Junction in October of 2007, when the events in question took place. (PAF ¶¶ 22–23; Waitkevich Tr., Pl. Ex. E at 15:15–17). The HSA is responsible for "assuring that all inmates have access to quality health care." (Policy & Procedure Manual, Responsible Health Authority (Essential), Policy 2.00, ¶ 2, Pl. Ex. L). Waitkevich also supervised Jeffrey Fisher, the Director of Nursing. (Waitkevich Tr., Pl. Ex. E at 17:11–8:2).

Within a few days of Jaundoo's crutches being removed, Fisher verbally informed Waitkevich that Jaundoo had been "observed by correctional staff running in his unit," and that, as a result, "there was a question raised that he no longer required crutches" and his "crutches had been removed." (PAF ¶ 26; Waitkevich Tr., Pl. Ex. E at 27:8–22; 28:3–10). Waitkevich did not conduct an investigation following this conversation. (UMCH Defs. Reply (Docket No. 79) at 5).

In his role as the HSA, Waitkevich was often the person responsible for responding to inmate medical grievances. (PAF ¶ 25; Waitkevich Tr., Pl. Ex. E at 21:5–11). As noted above, Jaundoo submitted a Grievance on or around October 14, 2007. It was marked as "received" on October 16, 2007 and routed to "HSA." (Grievance dated Oct. 14, 2007, UMCH Ex. 19). Under DOC policies, Waitkevich was required to respond to Jaundoo's Grievance within ten days of receiving it. (PAF ¶ 28; Policy & Procedure Manual, Clinical Grievance Mechanism, Policy 12.00, UMCH Ex. 24). Jaundoo fell on October 18, 2007, two days after his Grievance was received. (UMCH DF ¶ 42; PR ¶ 42). Waitkevich responded to Jaundoo's Grievance on November 12, 2007. (PAF ¶ 29; Grievance Response dated Nov. 12, 2007, Pl. Ex. H). In his response, Waitkevich stated as follows:

> After consideration of your grievance and further investigation into the mat-

ter, it was determined that on 10/11/07 correctional staff observed you run from the day room to the A–1 Unit gate to see the recreation officer. You were asked where your crutches were and correctional staff reported you replied, "I don't need them to run, hop or fight." My understanding is that your crutches were removed at that time. I understand since that time you have reinjured your left knee and the crutches have been returned.

(Pl. Ex. H). Waitkevich was not a medical doctor, and he would generally bring grievances relating to medical treatment to Fisher, the mental health director, or another provider depending on the circumstances. (Waitkevich Tr., UMCH Ex. 25 at 35:16–36:16).

Additional facts will be provided below where appropriate.

## III. *ANALYSIS*

### A. *Standard of Review*

#### 1. *Summary Judgment*

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) (quotations and citations omitted). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." *Id.* (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 324, 106 S.Ct. at 2553. "[T]he nonmoving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial. *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." *Walsh v. Town of Lakeville,* 431 F.Supp.2d 134, 143 (D.Mass.2006).

### 2. *Deliberate Indifference*

Jaundoo has brought claims against all the defendants for deliberate indifference pursuant to 42 U.S.C. § 1983. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." *Soto v. Flores,* 103 F.3d 1056, 1061 (1st Cir.1997). In the instant case, it is undisputed that the defendants were acting under color of state law. Thus, the issue is whether there was a violation of Jaundoo's constitutional rights.

The Eighth Amendment imposes duties on prison officials to provide "humane conditions of confinement." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994). Among those duties is the duty of prison officials to "ensure that inmates receive adequate food, clothing, shelter, and *medical care* ...." *Id.* (emphasis added). "When, as here, a convict claims that state prison officials violated the Eighth Amendment by withholding essential health care, he must prove that the defendants' actions amounted to 'deliberate indifference to a serious medical need'." *DesRosiers v. Moran,* 949 F.2d 15, 18 (1st Cir.1991) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976)). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. at 104, 97 S.Ct. at 291 (citation omitted). This is so because "denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose" and is "inconsistent with contemporary standards of decency...." *Id.* at 103, 97 S.Ct. at 290 (citations omitted).

Deliberate indifference has both an objective and a subjective element, although "these components may overlap or merge." *Id.* at 19. The plaintiff "must show [he had] a serious medical need" to satisfy the objective element of the inquiry, and "he must prove the defendant's purposeful indifference" to that need to satisfy the subjective element. *Sires v. Berman,* 834 F.2d 9, 12 (1st Cir.1987).

A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mahan v. Plymouth County House of Corr.,* 64 F.3d 14, 18 (1st Cir. 1995) (quotations and citation omitted).

"The requisite state of mind may be manifested by the officials' response to an inmate's known needs or by denial, delay, or interference with prescribed health care." *DesRosiers v. Moran,* 949 F.2d at 19.

■■ Evidence that shows "substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment [is] insufficient to prove a constitutional violation." *Ruiz–Rosa v. Rullan,* 485 F.3d 150, 156 (1st Cir.2007). Rather, deliberate indifference "may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with 'actual knowledge of impending harm, easily preventable.'" *Id.* (quoting *Feeney v. Corr. Med. Servs., Inc.,* 464 F.3d 158, 162 (1st Cir.2006)). Thus,

> [w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Farmer,* 511 U.S. at 842, 114 S.Ct. at 1981 (internal citations omitted).

■ Finally, "[a] state-of-mind issue such as the existence of deliberate indifference usually presents a jury question. However, where there is no evidence of treatment so inadequate as to shock the conscience, let alone that any deficiency was intentional, or evidence of acts or omissions so dangerous (in respect to health or safety) that [the] defendant's knowledge of a large risk can be inferred, summary judgment is appropriate." *Torraco v. Maloney,* 923 F.2d 231, 234 (1st Cir.1991) (internal quotations and citations omitted).

As detailed below, Jaundoo has put forth sufficient facts which, if believed by a jury, are sufficient to state a claim for deliberate indifference against Kearnan and Berry. However, Waitkevich's motion for summary judgment should be allowed.

### B. *Kearnan's Motion for Summary Judgment*

Kearnan contends that he is entitled to summary judgment on Jaundoo's claim of deliberate indifference because he was entitled to rely on the medical staff, the actions of the medical staff in removing Jaundoo's crutches was the cause of any injuries, and he is entitled to qualified immunity.[10] For the reasons detailed herein, this court finds that there are material facts in dispute, and that Kearnan's motion for summary judgment should be denied.

#### 1. *Serious Medical Need*

■ Kearnan argues first that as of October 2007, Jaundoo no longer needed crutches as his knee had healed sufficiently so that he only required the Bledsoe brace. Consequently, Kearnan claims, Jaundoo did not have a serious medical need for the crutches so there is no basis for his constitutional claim. In support of his argument, Kearnan relies on Dr. Carillo's October 4, 2007 examination notes.[11]

---

10. Kearnan also contends that he is entitled to summary judgment because Berry and Waitkevich are entitled to summary judgment. The merits of the UMCH defendants' motion for summary judgment are discussed *infra.*

11. It is undisputed that these notes would not have been available for review when the crutches were removed since the notes were not signed until October 16, 2007. Kearnan is apparently relying on these notes for the *fact* that Jaundoo did not need crutches on October 11, 2007. He is not arguing that Berry relied on these notes.

However, there are material facts in dispute and it should be left to the jury to determine whether Jaundoo had a serious medical need for the crutches.

As detailed above, Jaundoo was using crutches throughout his rehabilitation, even though they are not expressly referenced in all the medical notes. (*See, e.g.,* UMCH Exs. 6, 7). There is no unambiguous order that Jaundoo no longer needed the crutches. When Jaundoo underwent his second surgery, Dr. Carillo questioned why the crutches had been taken away from him. (*See* Pl. Ex. G). Since Dr. Carillo was Jaundoo's treating physician throughout his rehabilitation and was surprised that he no longer had the crutches, a jury can find that Jaundoo had a serious medical need for the crutches at the time they were removed.

The report of October 4, 2007 also does not clearly support Kearnan's position. (*See* UMCH Ex. 10). Thus, although the report notes that Jaundoo was going to "increase his weightbearing status to full weightbearing" and was asked to "maintain the Bledsoe brace for protection," it makes no mention of either the use or discontinuance of the use of crutches. Moreover, it is also reported that "[p]hysical therapy *can advance this patient to full weightbearing*" and notes that Jaundoo's "quads *continue to appear atrophied* ..." thereby indicating that Jaundoo had not yet attained full weightbearing status. (Emphasis added). In addition, according to Dr. Carillo, a patient may still need to use crutches during the "full weightbearing" phase of rehabilitation. (PAF ¶ 5; Carillo Tr., Pl. Ex. A at 52:9–15). In sum, when the record is viewed in the light most favorable to the non-moving party, as it must be, Jaundoo's actual need for crutches is a material fact that is in dispute.

### 2. *Reliance on Medical Personnel*

Kearnan argues that he is entitled to summary judgment because he was entitled to rely on medical personnel and his actions did not cause any injury to Jaundoo. This argument must fail. There are disputed facts as to whether Kearnan, after exchanging words with Jaundoo, falsely reported, both orally and in writing, that Jaundoo was running on both feet without his crutches [12] and whether he conveyed this information to induce the medical staff to take away Jaundoo's crutches. Therefore, the motion for summary judgment must be denied.

As an initial matter, Kearnan argues that even assuming his report was false, it cannot rise to the level of a constitutional violation. However, *Freeman v. Rideout*, 808 F.2d 949 (2d Cir.1986), on which Kearnan relies, does not support his broad position. In *Freeman*, allegedly false claims by a corrections officer led to disciplinary charges against an inmate, a disciplinary hearing, and a sentence of 30 days in segregation. The court held that a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongfully accused of conduct which may result in the deprivation of a liberty interest" but, rather, an inmate only has the "right not to be deprived of a protected liberty interest without due process of law." *Id.* at 951. Since Freeman had been granted a hearing on the charges, his due process rights were protected. *Id.* at 953. See also *Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir.1995) (*Freeman* court held only "that

---

**12.** Even assuming that Jaundoo "admitted" in his Grievance that he said he did not need his crutches to "hop or fight" (*see* note 5, *supra* ), a jury would be able to find that this was not an admission that Jaundoo could walk and perform his daily activities without crutches. Rather, it could be read as a taunt to Kearnan that Jaundoo could defend himself even without crutches.

the prisoner's due process rights are protected if he is granted a hearing on the charges and given an opportunity to rebut them"). *Freeman* does not stand for the proposition that false reports can never form the basis for constitutional violations, and there are cases clearly holding to the contrary. *See id.* at 679–80 ("we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the procedural due process claim at issue in *Freeman*"). In short, nothing in *Freeman* or its progeny preclude a false disciplinary report from forming the basis of an Eighth Amendment claim. Although Kearnan may be correct that a prisoner does not have a "constitutionally guaranteed immunity from being falsely or wrongly accused," a prisoner does, according to the Supreme Court, have a right to be free from intentional interference with prescribed medical treatment. *See Estelle v. Gamble*, 429 U.S. at 104–105, 97 S.Ct. at 291. The fact that a prison official may have interfered with a prisoner's treatment by making a false allegation against him, rather than employing a more direct form of interference, does not protect the officer from liability.

Kearnan's contention that he cannot be held liable because medical personnel made the actual decision to remove the crutches is equally unavailing at this stage in this litigation. This is not a case, like the ones on which Kearnan relies, where supervisory personnel at a prison are found not liable for medical decisions in which they played no role. *See, e.g., Camberos v. Branstad*, 73 F.3d 174 (8th Cir. 1995) (treatment director and warden who "lacked medical expertise," "cannot be liable for the medical staff's diagnostic decision not to refer [inmate] to a doctor to treat his shoulder injury"); *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir.1977) (warden cannot be held liable for allegedly improper diagnosis by trained medical doctors). Here, the allegation is that Kearnan directly provided false information to the medical personnel on which the medical personnel were expected to and did rely. Kearnan cannot escape liability by relying on the medical personnel's decision.

*Sanchez v. Pereira–Castillo*, 590 F.3d 31 (1st Cir.2009), defines the principles that control in the instant case even though, as Kearnan argues, the facts of *Sanchez* are more egregious. In *Sanchez,* the court found that prison personnel could be held liable for surgery to remove a [non-existent] cell phone from an inmate's rectum as a violation of the inmate's Fourth Amendment rights, even though the surgery was done by medical personnel since, according to the compliant, the surgery was performed at the insistence of the correctional officials. As the First Circuit held:

> We employ common law tort principles when conducting inquiries into causation under § 1983. The language of § 1983 demands as much. The statute imposes liability upon those who "subject or cause to be subjected any citizen to a deprivation of a constitutional right." 42 U.S.C. § 1983. We have explained that the causal connection alluded to by the statute can be established not only by some kind of personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury. Put another way, an actor is responsible for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties.

*Id.* at 50–51 (internal quotations, punctuation and citations omitted).

The record before this court shows there are material facts in dispute that, if resolved in Jaundoo's favor, would allow a reasonable jury to find that Kearnan's transmission of the presumably false report to Fisher "set[ ] in motion a series of acts by others which [Kearnan knew] or reasonably should [have] know[n] would cause others to inflict the constitutional injury" and that Kearnan acted with the intent to punish Jaundoo. *Id.* For example, but without limitation, there is evidence from which a jury could find that Jaundoo was disrespectful to Kearnan, after which Kearnan went outside his chain of command to make sure that the Director of Nursing was advised, falsely, that Jaundoo was able to run without crutches. (*See* DF ¶¶ 2, 19; PR ¶¶ 2, 19). A logical inference would be that the report was made for the purpose of inducing the medical personnel to take the crutches away. Moreover, it appears to have been common practice for medical personnel to review disciplinary reports, so Kearnan should have known that his report would carry much weight. In fact, Kearnan's report was relied on by Fisher, Berry and Waitkevich.

In sum, it is for the jury to resolve the material issues of fact which are in dispute. There are sufficient facts which, if proven, can establish that Kearnan is liable for a violation of Jaundoo's Eighth Amendment rights.

## C. *Berry's Motion for Summary Judgment*

██ Berry argues that her conduct does not rise to the level of deliberate indifference because she acted reasonably under the circumstances in concluding that Jaundoo no longer needed his crutches, and there is no evidence that she had a culpable state of mind. This court finds that there are material facts in dispute which preclude the entry of summary judgment in Berry's favor.

As an initial matter it is undisputed that the removal of a patient's crutches is a serious medical decision which, if done prematurely, could expose the patient to unnecessary pain and pose a serious risk to health and safety. Jaundoo had recently undergone surgery on his knee, and his crutches were being used as part of his recuperation from such surgery. The fact that Jaundoo had a serious problem with his knee was visibly apparent since he used a Bledsoe brace. The jury could conclude that Berry knew or had reason to know of Jaundoo's serious medical condition and the need to proceed cautiously in removing his crutches. (*See* UMCH Defs. Mem. (Docket No. 67) at 7 ("the Defendants fully appreciated the severity of Jaundoo's condition.")).

As detailed above, it is disputed whether Berry exceeded her authority in ordering that the crutches be removed without an express order from the treating physician. Moreover, it appears that Berry may have violated prison regulations by failing to provide a written description of the basis of her decision. These are issues which need to be resolved by a jury.

Berry contends that she reasonably relied on Jaundoo's records from LSH, in particular the report of September 6, 2007. (*See id.* at 9). However, there is a factual dispute as to whether Berry actually reviewed the medical records. While Berry testified that it would have been her practice to do so, she also testified that she had no recollection of having done so in Jaundoo's case. Furthermore, the report of September 6, 2007 provides only that Jaundoo can "start weightbear to tolerance;" it does not state that his crutches have been removed. (UMCH Ex. 7). It is

for the jury to decide whether this reference was sufficient to justify removing crutches from someone who was recuperating from knee surgery, or whether the decision was reckless.

Berry contends that she "also had the benefit of information from correctional officers who had seen Mr. Jaundoo moving around the unit without his crutches." (UMCH Defs. Mem. (Docket No. 67) at 9). Assuming, *arguendo*, that Berry was entitled to rely on Kearnan's report, a jury needs to determine whether it was reckless for Berry to rely solely on the single reference to seeing Jaundoo on one occasion without crutches, and, based on that one sighting, to decide not to examine Jaundoo or inquire further about the circumstances surrounding the incident. (*See* PAF ¶ 11: Dr. Carillo generally conducts a physical examination before removing crutches). Finally Berry contends that she "also had the benefit of Mr. Jaundoo's own statement that he did not need his crutches to run, hop or fight." (UMCH Defs. Mem. at 9). Berry will have to convince the jury that she believed that this statement, as referenced in Kearnan's report, was an admission that Jaundoo no longer needed his crutches to get around, especially in light of his protestations to the contrary. A jury may find, on the other hand, that this statement as reported reflected a disrespectful interchange between a prisoner and a corrections officer, but was not an admission that the crutches were no longer needed.

Without belaboring the point these facts, and others, establish that the material facts of this case are in dispute. There is evidence from which, if believed, a reasonable factfinder could conclude that the "decision[] about [Jaundoo's] medical care [was] made recklessly with actual knowledge of impending harm, easily preventable." *Ruiz–Rosa*, 485 F.3d at 156 (internal quotation omitted). If a jury were to resolve some or all of the disputed facts in Jaundoo favor, it could reasonably conclude Berry's acts and omissions were "so dangerous (in respect to health or safety) that [her] knowledge of a large risk [could] be inferred" and she was, therefore, deliberately indifferent. *See Torraco*, 923 F.2d at 234. Because this court is not sitting as a finder of fact at this juncture and must resolve all disputed facts supported by the record in Jaundoo's favor, Berry's motion for summary judgment should be denied.

### D. *Waitkevich's Motion for Summary Judgment*

 Waitkevich argues that his conduct does not rise to the level of deliberate indifference. This court agrees and recommends that his motion for summary judgment be allowed.

During the incident in question, Waitkevich was the Health Services Administrator of MCI–Cedar Junction. As a general statement, in that capacity he was responsible for "assuring that all inmates ha[d] access to quality health care." (Pl. Ex. L; PAF ¶ 23). A most liberal reading of the complaint in Jaundoo's favor establishes only that Waitkevich was advised by the Director of Nursing several days after the incident between Kearnan and Jaundoo that Jaundoo's crutches had been removed. He received a Grievance from Jaundoo on October 16, 2007 complaining about the removal of the crutches, but did not investigate the matter. As noted above, Jaundoo fell again on October 18, 2007. Waitkevich responded to the Grievance on November 12, 2007.

 "When a supervisory official is placed on actual notice of a prisoner's need for physical protection or medical care, administrative negligence can rise to the level of deliberate indifference to or reckless disregard for that prisoner's safety.

The question is, charging them with reasonable inquiry, and allowing for reliance on the opinions of the treating doctors, how did the overall picture appear? What appeared to lack doing? What could be done?" *Layne v. Vinzant*, 657 F.2d 468, 470–71 (1st Cir.1981) (internal quotations and citations omitted). An administrator of a large institution cannot be "held responsible for the individualized complaints of every prisoner in his charge, except on the basis of actual notice of facts at least sufficient to put him on inquiry." *Id.* at 471 n. 3.

In the instant case, the fact that Waitkevich knew that Jaundoo's crutches had been taken away is insufficient to put him on notice of any problem, much less one rising to the level of a potential constitutional violation. The only evidence is that Waitkevich received a straightforward report that Jaundoo had been seen running without his crutches, raising a question as to his need for the crutches, and that medical personnel had determined that the crutches should be removed. Jaundoo has not established that Waitkevich was responsible for reviewing every treatment decision made by medical personnel at Cedar Junction, and no reasonable jury could so find.

Waitkevich received Jaundoo's Grievance on October 16, 2007 at the earliest.[13] Therein Jaundoo complained that "I am in a lot of pain when I have to put my entire weight on my left leg" and requested that his crutches be returned. (UMCH Ex. 19). There is nothing in this Grievance which indicates that the situation was so critical that immediate action was needed.

It is undisputed that Waitkevich is not a doctor. Jaundoo argues that he should have investigated the situation, although he points to no constitutional right to have his grievance investigated, much less investigated immediately. Assuming, arguendo, that Waitkevich should have conducted an investigation, the fact that the investigation did not occur prior to October 18, 2007, when the re-injury occurred, does not rise to the level of deliberate indifference. Clearly any action Waitkevich did or did not take after October 18, 2007 is not relevant to Jaundoo's claim of injury on that date.

In Waitkevich's case "there is no evidence of treatment so inadequate as to shock the conscience, let alone that any deficiency was intentional, or evidence of acts or omissions so dangerous (in respect to health or safety) that [the] defendant's knowledge of a large risk can be inferred[.]" *Torraco v. Maloney*, 923 F.2d at 234 (internal quotations and citations omitted). Similarly, there is no evidence that Waitkevich acted either in order to punish Jaundoo, or recklessly " 'not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable.' " *Feeney v. Corr. Med. Servs., Inc.*, 464 F.3d 158, 162 (1st Cir. 2006) (quoting *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir.1993)). Consequently, summary judgment in his favor should be entered.

### E. *Qualified Immunity*

The defendants also contend that they are entitled to qualified immunity on Jaundoo's deliberate indifference claim. Since no constitutional violation was found in Waitkevich's case, there is no need for this court to reach his claim of qualified immunity and it declines to do so. This court concludes that there are disputed issues of fact with respect to the claim against Kearnan and Berry that preclude this court from finding that they are entitled to qualified immunity as a matter of law.

---

**13.** The Grievance seems to indicate that it was "routed" to HSA on October 16, 2007, but it does not indicate when it was received by HSA. (UMCH Ex. 19).

 "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quotations and citations omitted).

 The determination of whether an official is entitled to qualified immunity requires an assessment as to whether the facts alleged or shown by the plaintiff "make out a violation of a constitutional right" and, if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* at 815–16 (quotations and citations omitted). "[T]he second, 'clearly established,' step of the qualified immunity analysis ... in turn, has two aspects." *Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st Cir.2009). As the First Circuit has described:

One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation. To over-come qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights. Indeed, it is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

*Id.* (quotations, citations and alterations omitted). Thus, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quotations, citations and alterations omitted).

"[S]ince the Supreme Court has made it clear that the Eighth Amendment protects prisoners from the deliberate denial of necessary care for serious medical conditions, ... the 'clearly established' requirement ... has been met." *Navedo v. Maloney,* 172 F.Supp.2d 276, 286 (D.Mass.2001). With respect to Kearnan, it cannot be seriously argued that he did not know it was improper to file a false report for the purpose of causing a prisoner harm.[14]

 Kearnan contends that he "acted in accordance with his patently obvious discretion to report goings on in prison, and at no time did he overstep his authority into the realm of making a medical decision...." (Kearnan Mem. (Docket No. 72) at 9). These arguments are not persuasive. Although Kearnan may have had

---

**14.** This court notes that because there is a real danger that a prisoner could use crutches as a weapon, an official would certainly be justified in bringing it to the attention of his supervisor or the facility's medical personnel that a prisoner no longer appeared to be using his prescribed crutches. Here, however-er, the issue is whether Kearnan actually observed conduct and exchanged words with Jaundoo that would have indicated to him that Jaundoo did not need crutches or, as Jaundoo alleges, if Kearnan intentionally gave a false account of what he observed to retaliate against Jaundoo for being disrespectful.

discretion to file reports, Kearnan points to no legal or evidentiary support for the proposition that he or corrections officers generally have any discretion to file intentionally false reports or that Kearnan reasonably believed that he had such discretion. And, while there is no allegation that Kearnan actually made the "medical decision" that led to Jaundoo's crutches being removed, there are numerous questions of fact concerning whether he caused that medical decision to be made. The existence of such factual disputes precludes the application of qualified immunity in Kearnan's favor at this time.

■■■■ With respect to Berry, the court cannot conclude that a reasonable nurse would not recognize that given his medical condition, discontinuing Jaundoo's prescribed crutches without conducting any type of review (and possibly without authority to do so) would constitute an unconstitutional denial of Jaundoo's right to necessary medical care. *See Hegarty v. Somerset County*, 53 F.3d 1367, 1373 (1st Cir.1995) ("we will deny the immunity claim if a reasonable official situated in the same circumstances should have understood that the challenged conduct violated [the plaintiff's] established right"). Like Kearnan, the disputed material facts in this case preclude the application of the doctrine of qualified immunity in favor of Berry at this time.

## IV. CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the UMCH defendants' Motion for Summary Judgment (Docket No. 65) be DENIED with respect to Rosalie Berry and ALLOWED with respect to Mark Waitkevich, and that the Motion of John Kearnan for Summary judgment (Docket No. 70) be DENIED.[15]

March 14, 2011

---

**15.** The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See*

*Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn*, 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 4 (1st Cir. 1998).